**AMERICAN MINING CONGRESS and Engelhard Corporation, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

**Edison Electric Institute, et al., American Paper Institute, et al., Hazardous Waste Treatment Council, Intervenors.**

**AMERICAN PETROLEUM INSTITUTE, Petitioner**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Respondent,**

**Edison Electric Institute, et al., American Paper Institute, et al., Hazardous Waste Treatment Council, Intervenors.**

Nos. 85–1206, 85–1208.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 14, 1986.

Decided July 31, 1987.

John D. Fognani, with whom Lynn G. Guissinger, Denver, Colo., James R. Walpole and John D. Austin, Jr., Washington, D.C., were on the brief, for petitioners, American Min. Congress, et al. in No. 85–1206. Larry A. Boggs, Washington, D.C., entered an appearance for petitioners in No. 85–1206.

Stark Ritchie, with whom Stephen E. Williams, James B. Atkin, Arnold S. Block and George William Frick, Washington, D.C., for petitioner, American Petroleum Institute in No. 85–1208.

George B. Henderson, II, Atty., Dept. of Justice, with whom Margaret N. Strand, Chief, Environmental Defense Section, Dept. of Justice, Francis S. Blake, General Counsel and Steven E. Silverman, Atty., E.P.A., Washington, D.C., were on the brief, for respondent in Nos. 85–1206 and 85–1208.

David R. Case, with whom Ridgway M. Hall, Jr., Washington, D.C., was on the brief, for intervenor, Hazardous Waste Treatment Council in Nos. 85–1206 and 85–1208. William Want and Nancy S. Bryson, Washington, D.C., entered appearances for intervenor.

William R. Weissman, Washington, D.C., entered an appearance for intervenors, Edison Elec. Institute, et al., in Nos. 85–1206 and 85–1208.

David J. Greenwald, III entered an appearance for intervenors, American Paper Institute, et al., in Nos. 85–1206 and 85–1208.

Before STARR and MIKVA, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

Dissenting opinion filed by Circuit Judge MIKVA.

STARR, Circuit Judge:

These consolidated cases arise out of EPA's regulation of hazardous wastes under the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, 42 U.S.C. §§ 6901–6933 (1982 & Supp. III 1985). Petitioners, trade associations representing mining and oil refining interests, challenge regulations promulgated by EPA that amend the definition of "solid waste" to establish and define the agency's authority to regulate secondary materials reused within an industry's ongoing production process. In plain English, petitioners maintain that EPA has exceeded its regulatory authority in seeking to bring materials that are not discarded or otherwise disposed of within the compass of "waste."

I

RCRA is a comprehensive environmental statute under which EPA is granted authority to regulate solid and hazardous wastes. RCRA was enacted in 1976, and amended in 1978, 1980, and 1984. *See* The

Quiet Communities Act of 1978, Pub.L. No. 95–609, 92 Stat. 3081; The Solid Waste Disposal Act Amendment of 1980, Pub.L. No. 96–482, 94 Stat. 2334; Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98–616, 98 Stat. 3221.

Congress' "overriding concern" in enacting RCRA was to establish the framework for a national system to insure the safe management of hazardous waste. H.R. Rep. No. 1491, 94th Cong., 2d Sess. 3 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6238, 6240, 6241. In passing RCRA, Congress expressed concern over the "rising tide" in scrap, discarded, and waste materials. 42 U.S.C. § 6901 (a)(2). As the statute itself puts it, Congress was concerned with the need "to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices." *Id.* § 6901(a)(4). Congress thus crafted RCRA "to promote the protection of health and the environment and to conserve valuable material and energy resources." *Id.* § 6902.

RCRA includes two major parts: one deals with non-hazardous solid waste management and the other with hazardous waste management. Under the latter, EPA is directed to promulgate regulations establishing a comprehensive management system. *Id.* § 6921. EPA's authority, however, extends only to the regulation of "hazardous waste." Because "hazardous waste" is defined as a subset of "solid waste," *id* § 6903(5), the scope of EPA's jurisdiction is limited to those materials that constitute "solid waste." That pivotal term is defined by RCRA as

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility *and other discarded material,* including solid, liquid, semisolid or contained gaseous material, resulting from industrial, commercial, mining, and agricultural operations, and from community activities....

42 U.S.C. § 6903(27) (emphasis added). As will become evident, this case turns on the meaning of the phrase, "and other discarded material," contained in the statute's definitional provisions.

EPA's interpretation of "solid waste" has evolved over time. On May 19, 1980, EPA issued interim regulations defining "solid waste" to include a material that is "a manufacturing or mining by-product and sometimes is discarded." 45 Fed.Reg. 33,119 (1980). This definition contained two terms needing elucidation: "by-product" and "sometimes discarded." In its definition of "a manufacturing or mining by-product," EPA expressly *excluded* "an intermediate manufacturing or mining product which results from one of the steps in a manufacturing or mining process and is typically processed through the next step of the process within a short time." *Id.*

In 1983, the agency proposed narrowing amendments to the 1980 interim rule. 48 Fed.Reg. 14,472 (1983). The agency showed especial concern over *recycling* activities. In the preamble to the amendments, the agency observed that, in light of the interlocking statutory provisions and RCRA's legislative history, it was clear that "Congress indeed intended that materials being recycled or held for recycling can be wastes, and if hazardous, hazardous wastes." *Id.* at 14,473. The agency also asserted that "not only can materials destined for recycling or being recycled be solid and hazardous wastes, but the Agency clearly has the authority to regulate recycling activities as hazardous management." *Id.*

While asserting its interest in recycling activities (and materials being held for recycling), EPA's discussion left unclear whether the agency in fact believed its jurisdiction extended to materials recycled in an industry's on-going production processes, or only to materials disposed of and recycled as part of a waste management program. In its preamble, EPA stated that "the revised definition of solid waste sets out the Agency's view of its jurisdiction over the recycling of hazardous waste ... Proposed section 261.6 then contains exemptions from regulations for those hazardous waste recycling activities that we do not think require regulation." *Id.* at

14,476. The amended regulatory description of "solid waste" itself, then, did not include materials "used or reused as effective substitutes for raw materials in processes using raw materials as principal feedstocks." *Id.* at 14,508. EPA explained the exclusion as follows:

> [These] materials are being used essentially as raw materials and so ordinarily are not appropriate candidates for regulatory control. Moreover, when these materials are used to manufacture new products, the processes generally are normal manufacturing operations.... The Agency is reluctant to read the statute as regulating actual manufacturing processes.

*Id.* at 14,488. This, then, seemed clear: EPA was drawing a line between discarding and ultimate recycling, on the one hand, and a continuous or ongoing manufacturing process with one-site "recycling," on the other. If the activity fell within the latter category, then the materials were not deemed to be "discarded."

After receiving extensive comments, EPA issued its final rule on January 4, 1985. 50 Fed.Reg. 614 (1985). Under the final rule, materials are considered "solid waste" if they are abandoned by being disposed of, burned, or incinerated; or stored, treated, or accumulated before or in lieu of those activities. In addition, certain recycling activities fall within EPA's definition. EPA determines whether a material is a RCRA solid waste when it is recycled by examining both the material or substance itself and the recycling activity involved. The final rule identifies five categories of "secondary materials" (spent materials, sludges, by-products, commercial chemical products, and scrap metal). These "secondary materials" constitute "solid waste" when they are disposed of; burned for energy recovery or used to produce a fuel; reclaimed; or accumulated speculatively. *Id.* at 618–19, 664.[1] Under the final rule, if a material constitutes "solid waste," it is subject to RCRA regulation *unless* it is directly reused as an ingredient or as an effective substitute for a commercial product, or is returned as a raw material substitute to its original manufacturing process.[2] *Id.* In the jargon of the trade, the latter category is known as the "closed-loop" exception. In either case, the material must not first be "reclaimed" (processed to recover a usable product or regenerated). *Id.* EPA exempts these activities "because they are like ordinary usage of commercial products." *Id.* at 619.

## II

Petitioners, American Mining Congress ("AMC") and American Petroleum Institute ("API"), challenge the scope of EPA's final rule. Relying upon the statutory definition of "solid waste," petitioners contend that EPA's authority under RCRA is limited to controlling materials that are *discarded* or *intended for discard.* They argue that EPA's reuse and recycle rules, as applied to inprocess secondary materials, regulate materials that have not been discarded, and therefore exceed EPA's jurisdiction.[3]

---

**1.** Under the final rule, a "use constituting disposal" is defined as direct placement on land of wastes or products containing or derived from wastes. A material is "accumulated speculatively" if it is accumulated prior to being recycled. If the accumulator can show that the materials feasibly can be recycled, and that during a one-year calendar period the amount of material recycled or transferred for recycling is 75% or more of the amount present at the beginning of the year, the materials are not considered solid wastes. A material is "reclaimed" if it is processed to recover a usable product, or if it is regenerated. *Id.*

**2.** Specifically, the final rule excludes materials recycled by being: "(1) [u]sed or reused as ingredients in an industrial process to make a product, *provided the materials are not being reclaimed;* or (2) [u]sed or reused as effective substitutes for commercial products; or (3) [r]eturned to the original process from which they are generated, without first being reclaimed." *Id.* (emphasis added). In the third category, the material must be returned to the original manufacturing process as a substitute for raw material feedstock, and the process must use raw materials as principal feedstocks.

**3.** EPA's final rule currently exempts solid wastes generated from the smelting and refining of ores and minerals pursuant to 42 U.S.C. § 6921(b)(3)(A)(ii), which provides that solid wastes from the extraction, beneficiation, and processing of ores and minerals are exempt from regulation until at least six months after

To understand petitioners' claims, a passing familiarity with the nature of their industral processes is required.

*Petroleum.* Petroleum refineries vary greatly both in respect of their products and their processes. Most of their products, however, are complex mixtures of hydrocarbons produced through a number of interdependent and sometimes repetitious processing steps. In general, the refining process starts by "distilling" crude oil into various hydrocarbon streams or "fractions." The "fractions" are then subjected to a number of processing steps. Various hydrocarbon materials derived from virtually all stages of processing are combined or blended in order to produce products such as gasoline, fuel oil, and lubricating oils. Any hydrocarbons that are not usable in a particular form or state are returned to an appropriate stage in the refining process so they can eventually be used. Likewise, the hydrocarbons and materials which escape from a refinery's production vessels are gathered and, by a complex retrieval system, returned to appropriate parts of the refining process. Under EPA's final rule, this reuse and recycling of materials is subject to regulation under RCRA.

*Mining.* In the mining industry, primary metals production involves the extraction of fractions of a percent of a metal from a complex mineralogical matrix (i.e., the natural material in which minerals are embedded). Extractive metallurgy proceeds incrementally. Rome was not built in a day, and all metal cannot be extracted in one fell swoop. In consequence, materials are reprocessed in order to remove as much of the pure metal as possible from the natural ore. Under EPA's final rule, this reprocessed ore and the metal derived from it constitute "solid waste." What is more, valuable metal-bearing and mineral-bearing dusts are often released in processing a particular metal. The mining facility typically recaptures, recycles, and reuses these dusts, frequently in production processes different from the one from which the dusts were originally emitted. The challenged regulations encompass this reprocessing, to the mining industry's dismay.

Against this factual backdrop, we now examine the legal issues presented by petitioners' challenge.

### III

We observe at the outset of our inquiry that EPA's interpretation of the scope of

---

EPA has completed studies of such wastes. 45 Fed. Reg. 76,118, 76,619. The final rule also exempts petroleum refining wastes, or oils recovered from such wastes, that are recycled by reinserting them into the refining process along with the normal crude feedstock. 50 Fed. Reg. 49,164. Notwithstanding the exempt status of most mining and petroleum wastes, certain recycling practices of AMC and API are currently subject to substantive regulation under EPA's rules.

We therefore agree with the parties that the challenged regulations are ripe for review. With regard to the provisions of the final rule that currently apply to AMC and API, petitioners' claims are clearly ripe. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Because the validity of those provisions turns on the scope of EPA's regulatory authority, the central issue—whether EPA's interpretation that the term "discarded material" encompasses materials destined for recycling in an on-going production process is contrary to the statute—is properly before us.

In addition, the parties persuasively argue that petitioners' broader claims (about activities currently exempt) are ripe for review as well. *First,* under the initial step of *Abbott Labs'* analysis, the issues are fit for judicial resolution. The issues presented for review—whether EPA's final regulations are arbitrary, capricious, or in excess of statutory authority—are purely legal questions. Significantly, the agency has indicated no institutional interest in postponing review; to the contrary, EPA itself is vitally interested in having the case resolved. Moreover, its definition of "discarded" clearly seems to represent its final position. *Second,* with respect to *Abbott Labs'* step two, withholding court consideration would cause hardship to the parties. Congress, by enacting the 90-day review provision, made clear that prompt review of EPA's RCRA regulations was necessary to avoid needless delays in implementation of an important environmental program. As in *Eagle-Picher Indus., Inc. v. EPA,* 759 F.2d 905 (D.C.Cir.1984), this provision constitutes strong evidence that Congress has, in effect, decided that EPA's (and thus Congress') interest in effectuating RCRA's purpose will be hindered by postponing review. For these reasons, we are satisfied that the case is in an appropriate posture for resolution.

its authority under RCRA has been unclear and unsteady. As previously recounted, EPA has shifted from its vague "sometimes discarded" approach of 1980 to a proposed exclusion from regulation of all materials used or reused as effective substitutes for raw materials in 1983, and finally, to a very narrow exclusion of essentially only materials processed within the meaning of the "closed-loop" exception under the final rule. We emphasize, therefore, that we are confronted with neither a consistent nor a longstanding agency interpretation. Under settled doctrine, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *I.N.S. v. Cardoza-Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)). *See also FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981); *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563 (D.C.Cir.1987).

### A

Because the issue is one of statutory interpretation, the principles enunciated in *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny guide our inquiry.[4] In *Chevron,* a unanimous Supreme Court laid out a now familiar, general framework for analyzing agency interpretations of statutes. First, the reviewing court is to consider whether Congress "has directly spoken to the precise question at issue." *Id.* at 842. This inquiry focuses first on the language and structure of the statute itself. If the answer is not yielded by the statute, then the court is to look to secondary indicia of intent, such as the measure's legislative history. As the *Chevron* Court emphatically declared: "[I]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.

In cases where Congress' intent is not clear, the Supreme Court set forth a second analytical step: "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.... In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 843–44.

We thus begin our inquiry with the first step of *Chevron's* analysis: did Congress clearly intend to limit EPA's regulatory jurisdiction to materials disposed of or abandoned, as opposed to materials reused within an ongoing production process? Before directly addressing this question, we should not fail to observe that in its very recent decision in *Cardoza-Fonseca* the Supreme Court reaffirmed that *Chevron's* first step is by no means an empty formality, but is to the contrary a vital part of the judicial inquiry. Because of its importance in statutory-analysis cases, we pause briefly to examine that latest descendent in the *Chevron* lineage.

In that case, the Court addressed the question whether the standard of proof under section 208(a) of the Refugee Act, 8 U.S.C. § 1158(a), which authorizes the Attorney General, in his discretion, to grant asylum to an alien who is unable or unwilling to return to his or her home country "because of persecution or a well-founded

---

**4.** In *Chevron,* the question was how the agency could permissibly define the statutory term "stationary source" for purposes of the Clean Air Act. *See* 42 U.S.C. § 7502(b)(6) (1977). The issue, in brief, was whether in certain States a source was necessarily each individual smokestack (or other source point of emissions) or whether it could be an entire plant encapsulated, as it were, in a "bubble." After setting out the now familiar two-step framework, the Court concluded that Congress' intent as to the definition of "stationary source" was not clear and the agency's "bubble" construction was reasonable. *Id.* at 866.

fear of persecution" is coextensive with the standard employed under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), which requires the Attorney General to withhold deportation of an alien who demonstrates that his or her "life or freedom would be threatened" if he or she was deported. Using "traditional tools of statutory construction," the Court concluded that "Congress did not intend the two standards to be identical." 107 S.Ct. at 1221. In its analysis of the deference due the agency's interpretation, the Court, citing *Chevron,* drew a distinction between "pure" questions of statutory construction and questions of interpretation that arise in the application of a statute to a particular set of facts. *Id.* The "narrower" task of interpreting a statute in the abstract, according to the *Cardoza-Fonseca* Court, is "well within the province of the judiciary." *Id.* at 1222.

As we are confronted in this case with a "pure" question of statutory construction, we remain mindful of the fact that "[t]he judiciary is the final authority on issues of statutory construction.... If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 1221 (quoting *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9).[5]

### B

Guided by these principles, we turn to the statutory provision at issue here. Congress, it will be recalled, granted EPA power to regulate "solid waste." Congress specifically defined "solid waste" as "discarded material." EPA then defined "discarded material" to include materials destined for reuse in an industry's *ongoing* production processes. The challenge to EPA's jurisdictional reach is founded, again, on the proposition that in-process secondary materials are outside the bounds of EPA's lawful authority. Nothing has been *discarded,* the argument goes, and thus RCRA jurisdiction remains untriggered.

### 1

■ The first step in statutory interpretation is, of course, an analysis of the language itself. As the Supreme Court has often observed, "the starting point in every case involving statutory construction is 'the language employed by Congress.'" *CBS v. FCC,* 453 U.S. 367, 377, 101 S.Ct. 2813, 2820, 69 L.Ed.2d 706 (1981), (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979)).[6] In pursuit of Congress' intent, we "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Securities Industry Ass'n v. Board of Governors,* 468 U.S. 137, 149, 104 S.Ct. 2979, 2986, 82 L.Ed.2d 107 (1984) (quoting *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)). These sound principles governing the reading of statutes seem especially forceful in the context of the present case. Here, Congress defined "solid waste" as "discarded material."

---

5. This court recently construed the *Cardoza-Fonseca* opinion as teaching that "courts need not defer to agency opinions on 'pure questions' of interpretation." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock,* 816 F.2d 761, 764 (D.C.Cir.1987). In addition, the *International Union* court suggested that, under *Cardoza-Fonseca,* "the second prong of the *Chevron* test is only applicable ... when an agency is required to apply a legal standard to a particular set of facts, or when a court is unable to discern congressional intent after employing traditional tools of statutory construction." *Id.* at 765 n. 5. We decide this case under *Chevron's* first step, however, without reaching the possibility raised in *International Union.*

6. In *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), the Court, in distinguishing a prior opinion, indirectly reaffirmed the importance of the statute's language. There, the Court stated that "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Id.* at 341, 99 S.Ct. at 2332. The Court thus recognized that although a judicial opinion, as an *interpretation* of law, should be regarded with utmost seriousness and respect, the statute itself is what constitutes law and should be treated accordingly.

The ordinary, plain-English meaning of the word "discarded" is "disposed of," "thrown away" or "abandoned."[7] Encompassing materials retained for immediate reuse within the scope of "discarded material" strains, to say the least, the everyday usage of that term.

Although the "ordinary and obvious meaning of the [statutory] phrase is not to be lightly discounted," *Cardoza-Fonseca,* 107 S.Ct. at 1213, we are hesitant to attribute decisive significance to the ordinary meaning of statutory language. To be sure, our inquiry might well and wisely stop with the plain language of the statute, since it is the statute itself that Congress enacts and the President signs into law. But as the Supreme Court recently observed, the "more natural interpretation" (or plain meaning) is not necessarily determinative.[8] *Young v. Community Nutrition Institute,* 477 U.S. 974, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986). And it is not infrequently said, odd as it may seem in a society governed by codified and thus knowable rules, that a matter may be within the letter of a statute but not within its spirit. *See, e.g., California Federal Savings & Loan Association v. Guerra,* — U.S. ——, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Holy Trinity Church v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892).

We hasten to add that this is by no means to say that language employed by a legislative body in that which we call *law* is doomed to remain inherently unclear and ambiguous. The Supreme Court has held, in a variety of contexts, that the statutory terms themselves can and do clearly express Congress' intent. *See, e.g., Cardoza-Fonseca,* 107 S.Ct. at 1212–13 ("well-founded fear" standard obviously focuses on subjective belief); *Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (statutory language "legal right" means "just that"); *Sorenson v. Secretary of Treasury,* 475 U.S. 851, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986) (phrasing of statute revealed clear Congressional directive); *Securities Industry,* 104 S.Ct. at 2988 (literal meaning of "notes" sufficiently clear, rendering "functional analysis" impermissible);[9] *Library of Congress v. Shaw,* — U.S. ——, —— 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (U.S.1986) (recognizing that statutory language can clearly express Congress' intent to waive immunity); *International Union,* 816 F.2d 761, 765 (ordinary meaning of "employment" is "powerful evidence" of Congressional intent); *see also Westmoreland v. CBS,* 770 F.2d 1168, 1173–75 (D.C.Cir.1985) (language of Rule 11, Fed.R.Civ.P., requires court to impose sanctions if violation is found). *But see Chemical Manufacturers Association v. NRDC,* 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985) (where literalistic reading of statutory language would lead to absurd results, language has no plain

---

**7.** The dictionary definition of "discard" is "to drop, dismiss, let go, or get rid of as no longer useful, valuable, or pleasurable." Webster's Third New International Dictionary, G. & C. Merriam Co. (1981). It bears noting that the term "discarded" is neither inherently difficult to define nor is so intimately tied to knowledge of the industry and the practicalities of regulation that definition requires agency expertise. *Cf. United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1986) ("waters of the United States"); *Chevron,* 467 U.S. at 840, 104 S.Ct. at 2780 ("stationary source"); *Ass'n of Data Processing Serv. Org., Inc. v. Board of Governors,* 745 F.2d 677 (1984) ("closely related to banking").

**8.** In *Young,* the issue was whether the FDA was obliged to issue regulations establishing tolerances for certain toxic substances found in food.

The statute in question more naturally lent itself to a reading that would *require* the agency to promulgate regulations. *Id.* at 2364. Notwithstanding the clear thrust of the statutory language, the agency, supported by a long history of proceeding in the same manner, chose to regulate on an *ad hoc* basis, using informal "action levels" to guide the exercise of its enforcement discretion, rather than promulgating firm and fixed tolerance levels (i.e., regulations). The Court, finding that a dangling participle infected the statutory language and beclouded Congressional intent, held that the agency's interpretation was "sufficiently rational" to withstand scrutiny under *Chevron's* Step Two. *Id.*

**9.** As the *Securities Industry* case demonstrates, even a broad, general term such as "notes" can have a "literal meaning."

meaning). In view of this considerable body of learning with respect to the reading of statutes, pointing in quite different directions, we are frank to admit that in our analysis we dare accord the ordinary meaning of "discarded"—i.e., disposed of—considerable, but by no means conclusive, weight in our interpretive task.

■ In short, a complete analysis of the statutory term "discarded" calls for more than resort to the ordinary, everyday meaning of the specific language at hand. For, "the sense in which [a term] is used in a statute must be determined by reference to the purpose of the particular legislation." *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 6, 52 S.Ct. 275, 277, 76 L.Ed. 587 (1932).[10] The statutory provision cannot properly be torn from the law of which it is a part; context and structure are, as in examining any legal instrument, of substantial import in the interpretive exercise. *See, e.g., Stafford v. Briggs*, 444 U.S. 527, 535, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986); *Pennhurst State School v. Halderman*, 451 U.S. 1, 18–19, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981).

As we previously recounted, the broad objectives of RCRA are "to promote the protection of health and the environment and to conserve valuable material and energy resources...." 42 U.S.C. § 6902. But that goal is of majestic breadth, and it is difficult, as *Dimension Financial* taught us, to pour meaning into a highly specific term by resort to grand purposes. Somewhat more specifically, we have seen that RCRA was enacted in response to Congressional findings that the "rising tide of scrap, discarded, and waste materials" generated by consumers and increased indus-

trial production had presented heavily populated urban communities with "serious financial, management, intergovernmental, and technical problems in the disposal of solid wastes." *Id.* § 6901(a). In light of this problem, Congress determined that "[f]ederal action through financial and technical assistance and leadership in the development, demonstration, and application of new and improved methods and processes to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices was necessary." *Id.* Also animating Congress were its findings that "disposal of solid and hazardouse waste" without careful planning and management presents a danger to human health and the environment; that methods to "separate usable materials from solid waste" should be employed; and that usable energy can be produced from solid waste. *Id.* § 6901(b), (c), (d).

The question we face, then, is whether, in light of the National Legislature's expressly stated objectives and the underlying problems that motivated it to enact RCRA in the first instance, Congress was using the term "discarded" in its ordinary sense—"disposed of" or "abandoned"—or whether Congress was using it in a much more open-ended way, so as to encompass materials no longer useful in their original capacity though destined for immediate reuse in another phase of the industry's ongoing production process.

For the following reasons, we believe the former to be the case. RCRA was enacted, as the Congressional objectives and findings make clear, in an effort to help States deal with the ever-increasing problem of solid waste *disposal* by encouraging the search for and use of alternatives to exist-

---

**10.** We are mindful, however, that the "plain purpose" of the legislation should not be invoked at the expense of the terms of the statute. As the Court reminded us in *Dimension Financial*:

Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague

social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent. 106 S.Ct. at 689. That passage applies, we believe, with particular force here.

ing methods of disposal (including recycling) and protecting health and the environment by regulating hazardous wastes. To fulfill these purposes, it seems clear that EPA need not regulate "spent" materials that are recycled and reused in an *ongoing* manufacturing or industrial process.[11] These materials have not yet become part of the waste disposal problem; rather, *they are destined for beneficial reuse or recycling in a continuous process by the generating industry itself.*

The situation in this case thus stands in sharp contrast to that in *Riverside Bayview,* another post-*Chevron* case. There, the Corps of Engineers had defined "the waters of the United States" within the meaning of the Clean Water Act, 33 U.S.C. §§ 1311, 1362 (1972), to include "wetlands." Recognizing that it strained common sense to conclude that "Congress intended to abandon traditional notions of 'waters' and include in that term 'wetlands' as well," the Court performed a close and searching analysis of Congress' intent to determine if this counterintuitive result was nonetheless what Congress had in mind. *Id.* at 461–65. The Court based its holding (that the agency's expansive definition of "waters of the United States" was reasonable) on several factors: Congress' acquiescence in the agency's interpretation; provisions of the statute expressly including "wetlands" in the definition of "waters"; and, importantly, the danger that forbidding the Corps to regulate "wetlands" would defeat Congress' purpose since pollutants in "wetlands" water might well flow into "waters" that were indisputably jurisdictional. *Id.* at 465. Thus, due to the nature of the

water system, the very evil that Congress sought to interdict—the befouling of the "waters of the United States"—would likely occur were the Corps of Engineers' jurisdiction to stop short of wetlands. *Riverside Bayview,* 106 S.Ct. at 463.

The present case, on the other hand, seems to us more analogous to *Dimension Financial,* in which a unanimous Court rebuffed the attempt of the Federal Reserve Board to extend its jurisdiction to so-called "non-bank" banks, financial services institutions that were, in the Fed's view, functional equivalents of banks. The Court looked to the language and purpose of the governing statute and concluded that Congress' intent was clear: its definition of "bank" did not confer regulatory power over "non-bank banks." 106 S.Ct. at 686–89.[12] In *Dimension Financial,* no serious contention was advanced to the effect that the banking industry had a "seamless-web" nature. That is to say, the Federal Reserve Board's inability to regulate the functional equivalent of a bank, while obviously likely to leave unregulated activities similar to those animating Congress in enacting the banking laws, would not frustrate or defeat federal regulation of the *banking* industry. Here too, EPA's regulation of in-process materials, like the Fed's attempted regulation of "non-bank banks," seems to us an effort to get at the same evil (albeit, very broadly defined) that Congress had identified by extending the agency's regulatory compass, rather than, as with the regulation of wetlands, an attempt to reach activities that if left unregulated would sabotage the agency's regula-

---

**11.** EPA argues that a narrow reading of "discarded" would "vitiate" RCRA's remedial purpose. EPA Brief at 30–31. We cannot agree. EPA provides no explanation for this remarkable proposition, and we fail to see how not regulating in-process secondary materials in an on-going production process will subvert RCRA's waste disposal management goals. Our difficulty in discerning the stated necessity of this regulatory outreach is reinforced by the fact that the agency itself previously concluded that its regulatory authority did not extend to ongoing production processes of a manufacturer.

**12.** The Federal Reserve Board accomplished its jurisdictional outreach by amending and broad-

ening the definition of "bank" contained in its interpretative regulation. Under the Bank Holding Company Act of 1956, "bank" is defined as any institution that "(1) accepts deposits that the depositor has a legal right to withdraw on demand and (2) engages in the business of making commercial loans." In its regulation, the Board interpreted the first clause of this definition to include deposits that "as a matter of practice" are payable on demand, and interpreted the second clause to include commercial loan substitutes, that is, transactions through which credit is extended to commercial enterprises without the use of a conventional commercial loan. *Id.* at 683–84.

tory mission.[13] We are thus not presented with a situation in which Congress likely intended that the pivotal jurisdictional term be read in its broadest sense, detached from everyday parlance; instead, we have a situation in which Congress, perhaps through the process of legislative compromise which courts must be loathe to tear asunder, employed a term with a widely accepted meaning to define the materials that EPA could regulate under RCRA. *See Dimension Financial*, 106 S.Ct. at 689. And it was that term which the Congress of the United States passed and the President ultimately signed into law.

### 2

Our task in analyzing the statute also requires us to determine whether other provisions of RCRA shed light on the breadth with which Congress intended to define "discarded." As the Supreme Court reiterated a few years ago, in interpreting a statute, "[w]e do not ... construe statutory phrases in isolation; we read statutes as a whole." *United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). The structure of a statute, in short, is important in the sensitive task of divining Congress' meaning.

In its brief, EPA directed us to a number of statutory provisions, arguing that they support its expansive definition of "discarded." This turned out, however, to be a wild goose chase through the labyrinthine maze of 42 U.S.C., for as counsel for EPA commendably recognized at oral argument, those statutory provisions speak in terms of "hazardous" (or "solid") waste." [14] In consequence, EPA's various arguments based on the statute itself are, upon analysis, circular, relying upon the term "solid waste" or "hazardous waste" to extend the reach of those very terms. This, all would surely agree, will not do.

EPA has, however, advanced two arguments of potential merit based on specific RCRA provisions, and these therefore deserve our careful attention. *First*, EPA argues that § 6924(r)(2) of RCRA implicitly authorizes the agency to regulate recycled secondary materials. That subsection, we note at the outset, is highly specific; it exempts from a general labelling requirement fuels produced from petroleum refining waste containing oil if such materials (1) are "generated and reinserted on-site into the refining process" and (2) meet two other requirements, not relevant for our purposes.[15] It cannot go unnoticed that

---

13. We hasten to add that the "same evil" is not in fact involved here for the reasons previously set forth in the text.

14. Section 6901(b)(3), for example, refers to environmentally unsound practices for the "disposal or use of *solid waste*." 42 U.S.C. § 6901(b)(3). Subsections 6901(d)(1), (2) refer to *solid waste* as a potential source of energy. Section 6903(7) defines "hazardous waste management" to include, among other things, recovery of *hazardous wastes*. Section 6903(24) defines "resource recovery facility" as any facility at which *solid waste* is processed. Section 6921(d) regulates *hazardous waste* generated by a small quantity generator. Section 6924(*l*) bans the use of waste or used oil or other material which is contaminated with *hazardous waste* as a dust suppressant or road treatment. Section 6924(q)(2)(B) allows the administrator to exempt from certain requirements facilities which burn *de minimis* quantities of *hazardous waste* as fuel. Section 6924(j) refers to storage of *hazardous waste* which is stored for purposes of eventual recovery. Section 6942(c)(11) requires the Administrator to consider the market for materials recovered from *solid waste*. Section 6952 directs the Secretary of Commerce to develop specifications for the classification of

materials recovered from *wastes*. Section 6981 pertains to research, demonstration projects, training, and other activities involving *solid waste* management. Section 6982(p) directs the Administrator to conduct a study on the disposal and utilization of *solid waste* generated by mining activities. *See generally* 42 U.S.C. §§ 6901–87.

Section 6935 addresses "used oil" collected by and utilized in the "oil recycling industry." Oil recyclers typically collect discarded used oils, distill them, and sell the resulting material for use as fuel in boilers. Regulation of those activities is likewise consistent with an everyday reading of the term "discarded." It is only when EPA attempts to extend the scope of that provision to include the recycling of *undiscarded* oils at petroleum refineries that conflict occurs.

15. Section 6924(r)(2) provides:
  (2) Unless the Administrator determines otherwise as may be necessary to protect human health and the environment, [the labelling requirement] shall not apply to fuels produced from petroleum refining waste containing oil if—

this subsection can be interpreted to come into play only where the material has become "hazardous waste" by being disposed of, and then is generated and reinserted on-site into the refining process. This interpretation, needless to say, would be singularly unhelpful to the agency's case, involving once more the now familiar problem of circularity of argument. EPA asserts, however, that the more natural reading of this provision is that materials generated and reinserted on-site into the refining process can be "hazardous waste," and are exempted from the otherwise applicable labelling requirement. The House Report explained in this regard:

> This provision provides a limited and conditional exemption from the labelling requirement for certain petroleum fuel refiners. Refineries often take oily refining wastes and reintroduce these wastes into the refining process where the oil component is incorporated into product [sic] and contaminants are removed. The committee does not believe that the refinery should automatically have to place a warning label on these fuels should EPA fail to exempt refineries from the labelling requirements within twelve months.

H.R. No. 198, 98th Cong., 2d Sess. at 43 (1984), U.S.Code Cong. & Admin.News 1984, pp. 5576, 5602. Although we frankly agree that EPA's reading of this specific provision provides some support for its construction of RCRA's reach, it is, dispassionately viewed, of marginal force. For one thing, the provision has "no application to conventional fuels made by normal refining processes from recaptured hydrocarbon

(A) such materials are generated and reinserted on-site into the refining process;
(B) contaminants are removed; and
(C) such refining waste containing oil is converted along with normal process streams into petroleum-derived fuel products at a facility at which crude oil is refined into petroleum products and which is classified as a number SIC 2911 facility under the Office of Management and Budget Standard Industrial Classification Manual.

16. The dissent's argument that § 6924(q)(2)(A), which excepts from the labelling requirement of subsection (r) "petroleum refinery wastes containing oil which are converted into petroleum coke at the same facility at which such wastes

materials never intended to be discarded and never discarded." API's Reply Brief at 18–19. And, even more significantly, § 6924 itself is a provision defining "standards applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities." This strongly suggests that the labelling subsection is directed at material which has indeed become hazardous waste, has reached a hazardous waste treatment facility, and is being recycled at that point.[16] Such a construction would, of course, render EPA's argument in this respect as circular as its other contentions.

*Second,* EPA argues that § 6924(q)(1) evinces Congressional intent to include recycled in-process materials within the definition of "solid waste." We note at the outset that this provision is likewise a subsection of § 6924 and is therefore directed towards hazardous waste treatment facilities. The ever-present circularity problem thus looms here as well. But that is not all. EPA's argument is deficient in other respects too. Section 6924(q)(1) commands the agency to promulgate standards applicable to persons who produce, market, distribute, or burn fuels produced from or otherwise containing hazardous waste. The final sentence of that subparagraph states:

> [F]or purposes of this subsection, the term "hazardous waste listed under section 6921 of this title" includes any commercial chemical product which is listed under section 6921 of this title and which, in lieu of its original intended use, is (i) produced for use as (or as a compo-

were generated," is rendered a nullity by our interpretation of § 6924(r) demonstrates, with all respect, confusion with regard to this complex statute. Under our interpretation, the labelling requirement can indeed be applied to materials generated (presumably in a recycling procedure) on-site at a hazardous waste treatment facility. The exemption contained in § 6924(q)(2)(A) is fully consistent with this interpretation. It allows one particular type of recycled waste—petroleum refinery wastes containing oil which are converted into petroleum coke—to be excepted from the labelling requirement. Section 6924(q)(2)(A) thus does not "go without saying" under our interpretation of § 6924(r). Dissent at 1194.

nent of) a fuel, (ii) distributed for use as a fuel, or (iii) burned as a fuel.

Congress apparently added this language to override a then-existing EPA regulation which provided that unused commercial chemical products were solid wastes only when "discarded." 40 C.F.R. § 261.33 (1983). "Discarded" was at that time defined as abandoned (and not recycled) by being disposed, burned, or incinerated (but not burned for energy recovery). 40 C.F.R. § 261.2(c) (1983). As the House Report described the provision's scope:

> Hazardous waste, as used in this provision [6924(q)], includes not only wastes identified or listed as hazardous under EPA's regulations, but also includes any commercial chemical product (and related materials) listed pursuant to 40 C.F.R. § 261.33, which is not used for its original intended purpose but instead is burned or processed as fuel. (Under current EPA regulations, burning is not deemed to be a form of discard; hence listed commercial chemical products, unlike spent materials, by-products or sludges, are not deemed to be 'waste' when burned as fuel. They are only 'waste' when actually discarded or intended for discard.)

H.R.Rep. No. 198, 98th Cong., 1st Sess. 40, U.S.Code Cong. & Admin.News 1984, p. 5599.

We think it likely that in this provision Congress meant only to speak to the specific problem it identified—the burning of commercial chemicals as fuels, contrary to their original intended use. Congress addressed this problem by deeming the offending materials to be "discarded" and therefore within the statutory definition of "solid waste." This specific measure did not, however, revamp the basic definitional section of the statute.[17]

3

After this mind-numbing journey through RCRA, we return to the provision that is, after all, the one before us for examination. And that definitional section, we believe, indicates clear Congressional intent to limit EPA's authority. First, the definition of "solid waste" is situated in a section containing thirty-nine separate, defined terms. This is definitional specificity of the first order. The very care evidenced by Congress in defining RCRA's scope certainly suggests that Congress was concerned about delineating and thus cabining EPA's jurisdictional reach.

Second, the statutory definition of "solid waste" is quite specific. Although Congress well knows how to use broad terms and broad definitions, as for example, "waters of the United States" in *Riverside Bayview*, or in an altogether different setting, the term "intelligence source" in *CIA v. Sims*, 471 U.S. 159, 105 U.S. 1881, 85 L.Ed.2d 173 (1985), the definition here is carefully crafted with specificity. It contains three specific terms and then sets forth the broader term, "other discarded material." That definitional structure brings to mind a long-standing canon of statutory construction, *ejusdem generis*. Under that familiar canon, where general words follow the enumeration of particular classes of things, the general words are most naturally construed as applying only to things of the same general class as those enumerated. Lest the reader jump to unwarranted conclusions about an unwelcome renaissance of mechanical jurisprudence, we hasten to express our wariness of formalism and woodenness in the sensitive exercise of statutory construction. But, the precept of *ejusdem generis* contains more than a modicum of common sense and reason in the ascertainment of

---

**17.** EPA further contends, on a slightly different tack, that statutory provisions referring to reuse or recycling of "solid waste" indicate Congressional intent to include in the definition of "solid waste" materials not disposed of but destined for recycling in an industry's production processes. That contention, however, proves too much. One of RCRA's primary goals is to promote recovery of reusable material that is currently being "needlessly buried." 42 U.S.C. § 6901(c). EPA's argument ignores this objective and, in so doing, overlooks the natural interpretation that those statutory provisions are directed at the recycling of "solid waste" as a way to manage, and indeed benefit from, materials that present a waste management problem by virtue of having been disposed of.

meaning. *See Department of State v. Washington Post Co.*, 456 U.S. 595, 600, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982) (specific terms are "benchmarks for measuring" the general term). Here, the three particular classes—garbage, refuse, and sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility—contain materials that clearly fit within the ordinary, everyday sense of "discarded." It is most sensible to conclude that Congress, in adding the concluding phrase "other discarded material," meant to grant EPA authority over similar types of waste, but not to open up the federal regulatory reach of an entirely new category of materials, *i.e.*, materials neither disposed of nor abandoned, but passing in a continuous stream or flow from one production process to another.[18]

In sum, our analysis of the statute reveals clear Congressional intent to extend EPA's authority only to materials that are truly discarded, disposed of, thrown away, or abandoned. EPA nevertheless submits that the legislative history evinces a contrary intent. In that respect, a unanimous Supreme Court has recently provided guidance on the proper role of legislative history in statutory interpretation. In *Burlington Northern Railroad Co. v. Oklahoma Tax Commission*, ── U.S. ──, 107 S.Ct.

1855, 95 L.Ed.2d 404 (1987), the Court stated:

> The parties have canvassed at length the 15-year legislative history of the [Railroad Revitalization and Regulatory Reform] Act [49 U.S.C. § 11503], and of the protection against discriminatory state taxation which became § 11503. We find the results of that investigation inconclusive and irrelevant. Legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity, but "[i]n the absence of a 'clearly expressed legislative intention to the contrary,' the language of the statute itself 'must ordinarily be regarded as conclusive.' " *United States v. James*, 478 U.S. ──, ── [106 S.Ct. 3116, 3122, 92 L.Ed.2d 483] (1986), (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766] (1980). Unless exceptional circumstances dictate otherwise, "[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete." *Rubin v. United States*, 449 U.S. 424, 430 [101 S.Ct. 698, 701, 66 L.Ed.2d 633] (1981).

*Id.* at 1859–60; *see also Cardoza-Fonseca*, 107 S.Ct. at 1213 n. 12.[19] Although we find RCRA's statutory language unambiguous, and can discern no exceptional circumstances warranting resort to its legislative histo-

---

**18.** The dissent contends that RCRA's "functional" definition of the term "disposal" suggests that RCRA embodies a "functional approach to problems of waste disposal." Dissent at 7. Without quibbling over the propriety of characterizing the definition of "disposal" as "functional," we observe that Congress, in defining "disposal," was specific and precise:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). Far from indicating that Congress intended that the language used in its definitions be "functionally" interpreted, Congress' care and precision suggests that it intended to give the potentially vague terms that it was defining, such as "solid waste" and "disposal," specific content.

**19.** We pause to note that the Court's position in *Burlington Northern* is well-supported in Supreme Court jurisprudence and democratic theory. *See Maine v. Thiboutot*, 448 U.S. 1, 6 n. 4, 100 S.Ct. 2502, 2505 n. 4, 65 L.Ed.2d 555 (1980). As Justice Holmes wisely observed: "We do not inquire into what the legislature meant, we ask only what the statute means," *quoted in* Jackson, *Problems of Statutory Interpretation*, 8 F.R.D. 121 (1948). Because the Constitution requires Congress to act by *legislation*, and not merely through committee reports, it is small wonder that the Supreme Court has warned courts that "going behind the plain language of the statute ... is a step to be taken cautiously even under the best of circumstances." *United States v. Locke*, 471 U.S. 84, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985). As we begin our journey through the byways of legislative history, we will therefore bear in mind the sound principle that "legislative intention, without more, is not legislation." *Train v. City of New York*, 420 U.S. 35, 45, 95 S.Ct. 839, 845, 43 L.Ed.2d 1 (1975).

ry, we will nonetheless in an abundance of caution afford EPA the benefit of consideration of those secondary materials.

### 4

EPA points first to damage incidents cited by Congress in 1976 as justification for establishing a hazardous waste management system. *See* H.R.Rep. No. 1491, 94th Cong., 2d Sess. at 18, 22 (1976).[20] Neither of the incidents noted by EPA, however, involved commercial, in-process reuse or recycling activities. Instead, both incidents provide clear examples of waste *disposal,* which, of course, indisputably falls within EPA's jurisdiction conferred by RCRA.

EPA next asserts that the "most significant" aspect of the 1976 legislative history is the sense that Congress enacted broad grants of regulatory authority in order to " 'eliminate[ ] the last remaining loophole in environmental law.' " EPA Brief at 25–26 (quoting H.R.Rep. No. 1491, 94th Cong., 2d Sess. at 4, U.S.Code Cong. & Admin.News 1976, p. 6241). EPA, however, neglects to favor us with the entire sentence, and thereby misses the thrust of this passage. In pertinent part, the Report states as follows: "[The Committee] believes that the approach taken by this legislation eliminates the last remaining loophole in environmental law, that of *unregulated land disposal of discarded materials and hazardous wastes." Id.* (emphasis added)

Wanting support for its position in the 1976 legislative history, EPA argues that the 1984 legislative history of RCRA amendments ratifies the agency's interpretation. The agency relies heavily on the following passage from the Report of the House Committee on Energy and Commerce, which states:

This proposed section of the bill amends [proposed section 6921] of RCRA to require the Administrator to issue regulations regarding use, reuse, recycling, and reclamation of hazardous wastes. This provision is intended to reaffirm the Agency's existing authority to regulate as [sic] *hazardous waste* to the extent it may be necessary to protect human health and the environment. The Committee affirms that RCRA already provides regulatory authority over *these activities* (which authority the Agency has exercised to a limited degree) and in this provision is amending to clarify that materials being used, reused, recycled, or reclaimed can indeed be solid and hazardous wastes and that these various recycling activities may constitute hazardous waste treatment, storage, or disposal.

H.R.Rep. No. 198, 98th Cong., 2d Sess. at 46 (1984) U.S.Code Cong. & Admin.News 1984, p. 5605 (emphasis added). This language is ambiguous at best. The Report refers to the agency's existing authority to regulate *hazardous waste,*[21] which, as we saw before, renders EPA's argument circular. It is only in the context of "these activities"— regulation of "hazardous waste"—that the Report states that materials being used, reused, recycled, or reclaimed can be solid and hazardous wastes. Moreover, the Conference Report accompanying the bill enacted into law states: "The Conference substitute does not include the House provision on the use, reuse, recycling, and reclamation of *hazardous waste.* EPA has the authority to regulate *such activities* and an explicit mandate is not necessary." H.R. Conf.Rep. No. 1133, 98th Cong., 2d Sess. at 82, U.S.Code Cong. & Admin.News 1984, p. 5652 (1984) (emphasis added). Thus, with the exception of one passing phrase, which seems to us of limited probative value,[22] EPA is unable to point

---

**20.** In one incident, toxic metals leached from waste piles into an adjacent creek. *Id.* at 18. In another, a child was poisoned by contact with a pesticide drug being reused as a trash container. *Id.* at 22.

**21.** We note, with disappointment, that EPA attempted to buttress its weak argument by adding useful words to the language of the Report. In its brief, EPA quoted the Committee Report as stating: "This provision is intended to reaffirm the Agency's existing authority to regulate

[recycled materials] as hazardous waste...." EPA Brief at 26. Such revisionist additions will not do.

**22.** "Passing references and isolated phrases are not controlling when analyzing a legislative history." *Washington Post Co.,* 456 U.S. at 600, 102 S.Ct. at 1961. Indeed, the Court recently reiterated that, where the language of the statute appears to settle the question, courts should "look to the legislative history to determine only whether there is 'clearly expressed legislative

to any portion of the legislative history which supports its expansive and counterintuitive interpretation of the pivotal term, "discarded." [23]

To the contrary, a fair reading of the legislative history reveals intimations of an intent to regulate under RCRA only materials that have truly been discarded. Not only is the language of the legislative history fully consistent with the use of "discarded" in the sense of "disposed of," but it strains the language to read it otherwise. Most significantly, in discussing its choice of the words "discarded materials" to define "solid waste," the House Committee stated:

> Not only solid wastes, but also liquid and contained gaseous wastes, semi-solid wastes and sludges are the subjects of this legislation. Waste itself is a misleading word in the context of the committee's activity. *Much industrial and agricultural waste is reclaimed or put to new use and is therefore not a part of the discarded materials disposal problem the committee addresses.*

H.R.Rep. No. 1491, 94th Cong., 2d Sess. at 2, U.S.Code Cong. & Admin.News 1976, p. 6240 (emphasis added). The Committee then went on to explain that "the term discarded materials is used to identify collectively those substances often referred to as industrial, municipal or post-consumer waste; *refuse, trash, garbage, and sludge.*" *Id.* (emphasis added). Later in the Report, the Committee stated: "The

overwhelming concern of the Committee, however, is the effect on the population and environment of the *disposal* of discarded hazardous wastes.... Unless neutralized or otherwise properly managed in their *disposal,* hazardous wastes present a clear danger...." *Id.* at 3, U.S.Code Cong. & Admin.News 1976, p. 6241 (emphasis added). Throughout the Report, the Committee refers time and again to the problem motivating the enactment of RCRA as the *disposal* of waste.

In the Senate, a brief discussion took place as to the scope of the definition of "solid waste." In response to Senator Domenici's expression of concern that RCRA be aimed only at "the *disposal* of municipal and industrial wastes and not at the regulation of mining," Senator Randolph, the chairman of the Committee, unequivocally stated: "The bill definitely is directed at the *disposal* of municipal and industrial wastes." 122 Cong. Rec. 21,424 (1976) (emphasis added). To the extent this colloquy has probative value, *see supra* text at 1190–91 & n. 19, it cuts squarely against expansive agency notions of the breadth of its jurisdictional reach.

After all is said and done, we are satisfied that the legislative history, rather than evincing Congress' intent to define "discarded" to include in-process secondary materials employed in an ongoing manufacturing process, confirms that the term was

---

intention' contrary to that language, which would require [the court] to question the strong presumption that Congress expresses its intent through the language it chooses." *Cardoza-Fonseca,* 107 S.Ct. at 1213 n. 12. See *supra* n. 19. The brief reference from a committee report that EPA relies on hardly constitutes "clearly expressed legislative intention." *Cf. Hirschey v. FERC,* 777 F.2d 1, 7–8 (D.C.Cir.1985) (Scalia, J., concurring) ("[I]t [is] time for courts to become concerned about the fact that routine deference to the detail of committee reports, and the predictable expansion in that detail which routine deference has produced, are converting a system of judicial construction into a system of committee-staff prescription.")

**23.** EPA also cites three other statements in the 1984 legislative history. All refer to the regula-

tion of *hazardous waste,* and are therefore of no help to the agency. EPA Brief at 27–28.

We hasten to observe that even if the 1984 House or Conference Reports could reasonably be construed to support EPA's interpretation of its authority, they would be of limited value. "An assumption is not a law.... When uttered five years later it is mere commentary. Moreover, a committee is not the Congress. It cannot create a Congressional intent that did not exist, or amend a statute by a report." *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1082 (5th Cir. 1980), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1981). *Cf. Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 64 (1981) (Congressional acquiescence in longstanding executive interpretation indicates interpretation's validity); *Bob Jones Univ. v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

employed by the Article I branch in its ordinary, everyday sense.[24]

## IV

We are constrained to conclude that, in light of the language and structure of RCRA, the problems animating Congress to enact it, and the relevant portions of the legislative history, Congress clearly and unambiguously expressed its intent that "solid waste" (and therefore EPA's regulatory authority) be limited to materials that are "discarded" by virtue of being disposed of, abandoned, or thrown away.[25] While we do not lightly overturn an agency's reading of its own statute, we are persuaded that by regulating in-process secondary materials, EPA has acted in contravention of Congress' intent.[26] Accordingly, the petition for review is

*Granted.*

MIKVA, Circuit Judge, dissenting:

The court today strains to overturn the Environmental Protection Agency's inter-

---

**24.** The distinction between this case and *Chemical Manufacturers Ass'n v. NRDC*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985), is evident upon review of the factual background and bases for decision in that case. Under the Clean Water Act, 33 U.S.C. §§ 1251–1376 (1982 & Supp. III 1985) (as amended), EPA is directed to promulgate effluent limitations for sources discharging pollutants into water. Because of the difficulty of creating categores and classes suitable for uniform discharge standards, EPA employed a variance mechanism to ensure that atypical plants or facilities were not unfairly burdened. The Court, to be sure over strong dissent, held that statutory language forbidding EPA to "modify" national standards for the discharge of toxic water pollutants did not preclude the agency from issuing individualized variances from discharge standards. Stressing that EPA's challenged program acted as a "laudable corrective mechanism," the Court found, notwithstanding the seemingly clear language of the statute, that a clear expression of Congressional intent was lacking. The Court reasoned that a literalistic reading of the statutory language would lead to absurd results. (The Court emphasized, for instance, that "it makes little sense to construe the section to forbid EPA to amend its own standards, even to correct an error or to impose stricter requirements." *Id.* at 1108.) Moving beyond the language itself, the Court discerned no clear indications of intent in the legislative history. To the contrary, the Court found Congress' silence on this issue to be an implicit authorization of EPA's construction, in view of the fact that the Court had construed the Act to permit the variances only a few months before Congress acted to amend the Act. *Id.* at 1108–10.

Here, in contrast, a literalistic reading of the statutory language would not lead to nonsensical results; indeed, the traditional meaning of "discarded"—disposed of—comports with Congress' statutorily defined purpose. *See supra* text at 1185–87. In addition, the legislative history, as we have just detailed, contains clear indications of Congressional intent to cabin EPA's regulatory jurisdiction to materials that have been disposed of or abandoned. And, in light of the inconsistency of EPA's regulatory approach, this is not a case in which we can infer Congressional acquiescence in the agency's interpretation. *Cf. also Riverside Bayview*, 106 S.Ct. at 464–65 (administrative construction brought to Congress' attention through legislation specifically designed to supplant it); *Haig v. Agee*, 453 U.S. at 300, 101 S.Ct. at 2778 (Congress acquiesced in long-standing agency interpretation).

**25.** EPA also argues that this court has previously rejected the contention that a RCRA "waste" must first be discarded or thrown away. *See United States Brewers Ass'n, Inc. v. EPA*, 600 F.2d 974 (D.C.Cir.1979). We disagree. In *Brewers*, petitioners challenged the "Solid Waste Management Guidelines for Beverage Containers" promulgated by EPA pursuant to the Solid Waste Disposal Act, as amended by the Resource Recovery Act of 1970, and the 1976 enactment of RCRA. The beverage container guidelines required manufacturers, in effect, to mark containers as returnable. Noting that the Guidelines did not require a change in design or materials, the court stated:

> We fail to discern from the record any support for the suggestion that marking containers requires interference with decisions as to product or package design or materials.

*Id.* at 983. EPA had merely acted to ensure its ability to regulate the containers once they were actually discarded, or thrown away, by the consumer pursuant to its authority to plan and manage resource recovery and resource conservation. 42 U.S.C. § 6903(30) (1982) (defining "solid waste management"). The court did not discuss the definition of "solid waste" under § 6903(27). Nor did the court find that undiscarded materials fell within the definition of discarded materials, as EPA suggests.

**26.** Petitioner AMC also advances an arbitrary-and-capricious challenge to certain provisions of EPA's final rule. Because we decide that EPA exceeded its statutory authority in regulating in-process secondary materials, we do not reach AMC's arbitrary-and-capricious claims. Likewise, we need not reach AMC and API's contention that EPA failed to comply with the notice-and-comment requirements of the Administrative Procedure Act. 5 U.S.C. § 553(b) (1982).

pretation of the Resource Conservation and Recovery Act to authorize the regulation of certain recycled industrial materials. Under today's decision, the EPA is prohibited from regulating in-process secondary materials that contribute to the ominous problem that Congress sought to eradicate by passing the RCRA. In my opinion, the EPA has adequately demonstrated that its interpretation is a reasonable construction of an ambiguous term in a statute committed to the agency's administration. We therefore are obliged to defer to the agency's interpretation under the principles of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and *INS v. Cardoza-Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). I dissent.

### I.

I agree with the majority that the case turns on the definition of solid waste as "discarded material" in RCRA. *See* 42 U.S.C. § 6903(27). On its face, this definition would not necessarily encompass the in-process secondary materials at issue in this case. However, the EPA has pointed us to an important statutory provision and a key passage from the legislative history that strongly support the agency's interpretation. At a minimum, they establish that the issue is ambiguous, so that we must defer to the agency's solution if it is reasonable.

Section 6924 of RCRA, when carefully parsed, provides direct support for the EPA's interpretation. Two provisions in section 6924 are especially relevant to EPA's claim. Section 6924(r)(2) provides an exemption from RCRA's general labelling requirement for materials "generated and reinserted onsite into the refining process." The accompanying legislative history specifies that the provision is a special and narrow exemption that "applies only to wastes generated on-site in the refining process itself." H.R. No. 198, 98th Cong., 2d Sess. at 43 (1984), U.S.Code Cong. & Admin.News 1984, p. 5602. The clear implication of this statutory provision is that RCRA establishes the EPA's general juris-

diction to regulate wastes generated on-site but cabins that power in one particular area. If, as the majority contends, these materials were clearly meant to be beyond EPA's regulatory scope anyway, this exemption would be unnecessary.

The majority acknowledges the "marginal force" of the EPA's reading of section 6924(r)(2). Majority opinion (Maj. op.) at 1188. That would appear to be an implicit concession that the provision at least provokes ambiguity about the meaning of solid waste under RCRA. The majority then tries to finesse its way around the provision by claiming that it applies only to materials that already have been abandoned by the manufacturer and transported to a hazardous waste treatment facility. Maj. op. at 1188. A neighboring provision, however, plainly demonstrates the inadequacy of the majority's explanation. Section 6924(q)(2)(A) specifies that subsection (r), the labelling provision, normally "shall not apply to petroleum refinery wastes containing oil which are converted into petroleum coke *at the same facility at which such wastes were generated.*" (emphasis added.) This provision excepts from the labelling requirements one particular kind of material that is generated on-site and then reintroduced into the refining process. The majority's interpretation of subsection (r) makes nonsense of Congress' carefully drawn exception. If subsection (r) were intended to apply only to abandoned materials, 6924(q)(2)(A) would go without saying. The provision therefore indicates that subsection (r) in particular, and RCRA in general, are intended to reach certain materials recycled on-site.

More generally, 6924(q)(2)(A) refers directly to *wastes* that are generated in the refining process and then put to further beneficial use by being converted to petroleum coke. It provides specific textual evidence that RCRA's definition of the pivotal term "waste" comprises at least some materials that are generated in a primary process and then recycled into another on-site process.

The majority attempts to square its position with the apparently irreconcilable di-

rective in § 6924(q)(2)(A) by arguing that "[u]nder our interpretation, the labelling requirement can indeed be applied to materials generated (presumably in a recycling procedure) on-site at a hazardous waste treatment facility." Maj. op. at 1188 n. 16. The majority apparently is asserting that Congress' use of the term "wastes" in 6024(q)(2)(A) was meant to refer only to wastes generated from other wastes. This highly conclusory and unnatural reading demonstrates that the majority has lost its way through this complex statute. The complexity of a statute does not give courts additional leeway to ignore the deference due an agency interpretation; on the contrary, when the complexity stems from technical definitions and procedures, that deference is enhanced.

The legislative history of the 1984 RCRA amendments also cuts firmly in EPA's favor. The version of the bill passed by the House contained a section directing the agency to regulate hazardous wastes that are used, reused, recycled, or reclaimed. H.R. 2867, § 8. (This provision eventually was deleted on the ground that RCRA already provided the EPA with authority to regulate these materials. *See* H.R. Conf. Rep. No. 1133, 98th Cong., 2d Sess. at 82.) The report accompanying this provision explained:

> This provision is intended to reaffirm the Agency's existing authority to regulate as [sic] hazardous waste to the extent it may be necessary to protect human health and the environment. The Committee affirms that RCRA already provides regulatory authority over these activities (which authority the Agency has exercised to a limited degree) and in this provision is amending to clarify that *materials being used, reused, recycled, or reclaimed can indeed be solid and hazardous wastes and that these various recycling activities may constitute hazardous waste treatment, storage, or disposal.*

H.R.Rep. No. 198, 98th Cong., 2d Sess. (1984), U.S.Code Cong. & Admin.News 1984, p. 5605 (emphasis added).

It is hard to see how the majority can hold to its position that on-site recycled materials can never be waste in the face of this clear legislative history to the contrary. The majority grudgingly allows that this language is "ambiguous at best," maj. op. at 1191, apparently forgetting that EPA has only to demonstrate ambiguity to earn its reasonableness review. The majority then posits the theory that the legislative history pertains only to materials that already have been abandoned and thereby become hazardous waste. This interpretation is not credible. The legislative history states that materials being recycled *can* be solid and hazardous wastes. If the materials referred to already were hazardous wastes, this statement would be absurd. The statement rather indicates that recycled materials can constitute solid waste where they present the dangers to human health and the environment that RCRA is designed to control.

In sum, EPA has adduced support for its interpretation of the pivotal RCRA provision in other sections of the statute and in the accompanying legislative history. Moreover, contrary to the majority's gratuitous suggestion that passages from committee reports are of questionable value in discerning legislative intent, *see* maj. op. at 1191, n. 22, such reports afford us valuable guidance. They usually provide a considered and bipartisan commentary that illuminates the close issues courts are frequently called upon to adjudicate.

I acknowledge that the majority cites other evidence that casts some doubt on the agency's interpretation. But this is a concession that the agency can afford, while the majority cannot. EPA need demonstrate only that its definition of solid waste does not clearly contradict congressional intent. Section 6924 as well as the key piece of legislative history cited above provide ample evidence for that modest proposition. *Chevron* therefore requires us to give effect to the agency interpretation if it is reasonable.

In my opinion, the EPA's interpretation of solid waste is completely reasonable in light of the language, policies, and legisla-

tive history of RCRA. *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1986). Congress had broad remedial objectives in mind when it enacted RCRA, most notably to "regulat[e] the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on the environment." 42 U.S.C. § 6902(4). The disposal problem Congress was combatting encompassed more than just abandoned materials. RCRA makes this clear with its definition of the central statutory term "disposal":

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). This definition clearly encompasses more than the everyday meaning of disposal, which is a "discarding or throwing away." *Webster's Third International Dictionary* 654 (2d ed. 1981). The definition is *functional*: waste is disposed under this provision if it is put into contact with land or water in such a way as to pose the risks to health and environment that animated Congress to pass RCRA. Whether the manufacturer subjectively intends to put the material to additional use is irrelevant to this definition, as indeed it should be, because the manufacturer's state of mind bears no necessary relation to the hazards of the industrial processes he employs.

Faithful to RCRA's functional approach, EPA reasonably concluded that regulation of certain in-process secondary materials was necessary to carry out its mandate. The materials at issue in this case can pose the same risks as abandoned wastes, whether or not the manufacturer intends eventually to put them to further beneficial use. As the agency explained, "[s]imply because a waste is likely to be recycled will not ensure that it will not be spilled or leaked before recycling occurs." J.A. 67. The storage, transportation, and even recy-

cling of in-process secondary materials can cause severe environmental harm. Indeed, the EPA documented environmental disasters caused by the handling or storage of such materials. *See, e.g.*, J.A. 1729–30, 1721. It also pointed out the risk of damage from spills or leaks when certain in-process secondary materials are placed on land or in underground product storage. *See* J.A. 68.

Moreover, the agency's action is carefully aligned with Congress' functional approach to problems of waste disposal. The agency is not seeking to regulate all recycled materials. Rather, it has promulgated a complicated scheme of different categories so as to regulate materials only when they present the same types of environmental risks RCRA seeks to correct. *See* J.A. 68–70. EPA stressed that "to determine if a secondary material is a RCRA solid waste when recycled, one must examine both the material and the recycling activity involved. A consequence is that the same material can be a waste if it is recycled in certain ways, but would not be a waste if it is recycled in other ways." J.A. 69. Thus, the agency has sought to regulate these materials only when they present the risks Congress was combatting in RCRA.

I believe this case is controlled by *United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1986). In *Riverside Bayview*, the EPA offered an interpretation of "waters" that appeared at some tension with everyday usage. 106 S.Ct. at 462 ("On a purely linguistic level, it may appear unreasonable to classify 'lands,' wet or otherwise, as waters."). The Court therefore turned to the statutory scheme and legislative history of the Clean Water Act. It considered the agency's interpretation against the background of Congress' goals in enacting the statute. The Court found in the statute "a broad, systemic view of the goal of maintaining and improving water quality." *Id.* It then evaluated the reasonableness of the agency's interpretation in light of that goal. The Court wrote:

We cannot say that the Corps' conclusion that adjacent wetlands are inseparably bound up with the "waters" of the United States—based as it is on the Corps' and EPA's technical expertise—is unreasonable.... The Corps has concluded that wetlands may affect the water quality of adjacent lakes, rivers, and streams even when the waters of those bodies do not actually innundate the wetlands.... We cannot say that the Corps' judgment on these matters is unreasonable.

*Id.* at 463.

Similarly, in this case the EPA has interpreted solid waste in a manner that seems to expand the everyday usage of the word "discarded." Its conclusion, however, is fully supportable in light of the statutory scheme and legislative history of RCRA. The agency concluded that certain on-site recycled materials constitute an integral part of the waste disposal problem. This judgment is grounded in the EPA's technical expertise and is adequately supported by evidence in the record. The majority nevertheless reverses the agency because it believes that the materials at issue "have not yet become part of the waste disposal problem." Maj. op. at 1186. This declaration is nothing more than a substitution of the majority's own conclusions for the sound technical judgment of the EPA. The EPA's interpretation is a reasonable construction of an ambiguous statutory provision and should be upheld. *Chevron* and *Cardoza-Fonseca* are totally neutered by review such as the majority today affords.

*I dissent.*