907 F.2d 1179
 31 ERC 1935, 285 U.S.App.D.C. 173, 20
Envtl. L. Rep. 21,415
 AMERICAN MINING CONGRESS, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
The ALUMINUM ASSOCIATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
HORSEHEAD RESOURCE DEVELOPMENT COMPANY, INC., and Zinc
Corporation of America, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
The FERROALLOYS ASSOCIATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
PHELPS DODGE CORPORATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
ASARCO INCORPORATED, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 88-1835, 88-1837 to 88-1839, 88-1843 and 88-1869.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 1, 1990.
Decided July 10, 1990.
 
 J. Daniel Berry and Jeffrey S. Holik, with whom John N. Hanson, Aaron H. Goldberg, Edward M. Green and Roderick T. Dwyer, Washington, D.C., for American Min. Congress and Phelps Dodge Corp., and M. Barry Meyer, Washington, D.C., for The Aluminum Ass'n, John D. Fognani, Denver, Colo., and Patricia A. Rooney, Washington, D.C., for ASARCO, Inc., and Jeffrey O. Cerar, Washington, D.C., for The Zinc Corp. of America, et al., were on the joint brief for petitioners American Min. Congress, The Aluminum Ass'n, Horsehead Resource Development Co., Inc., The Ferroalloys Ass'n, Phelps Dodge Corp. and ASARCO Inc.
 Scott A. Schachter, Atty., Dept. of Justice, with whom Randolph L. Hill and Steven E. Silverman, Attys., U.S. E.P.A., Washington, D.C., were on the brief for respondent in all cases.
 Robert V. Percival, with whom Karen Florini, for Environmental Defense Fund, and David R. Case, Washington, D.C., for Hazardous Waste Treatment Council, were on the joint brief for intervenors in all cases.
 Before EDWARDS, SILBERMAN and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 Petitioners in these consolidated cases seek review of a final rule, see 53 Fed.Reg. 35,412 (1988) (codified at 40 C.F.R. pts. 261 and 302 (1989)) (the "1988 Rule"), promulgated by the Environmental Protection Agency ("EPA" or "agency").[1] In the 1988 Rule, EPA decided to relist as "haz ardous" six wastes generated from metal smelting operations. Petitioners argue that the relisting was beyond the agency's statutory authority, that in several respects the agency failed to offer an adequate reasoned explanation for its decision, and that the agency's decision to list the materials was promulgated without adequate opportunity for notice and comment.
 
 
 2
 We find petitioners' first contention to be without merit. In American Petroleum Inst. v. EPA, 906 F.2d 729, 740-742 (D.C.Cir.1990), this court expressly rejected the statutory authority argument on which petitioners rely here. We also find no merit in petitioners' claims that the agency failed to satisfy the notice-and-comment requirements of the Administrative Procedure Act ("APA"). The 1988 Rule reinstated a rule that the agency had withdrawn in 1980; however, petitioners had two opportunities for notice and comment before the 1988 Rule was promulgated. This was more than enough to satisfy the requirements of the APA. We therefore reject the petitions for review on these two issues.
 
 
 3
 As for petitioners' contentions regarding the adequacy of the agency's justifications for the 1988 Rule, we find merit in certain of the claims that have been advanced. Accordingly, we are constrained to remand for further consideration and explanation by the agency with respect to the bases for the relistings of certain of the smelting wastes.
 
 I. BACKGROUND
 A. Statutory and Regulatory Framework
 
 4
 Subtitle C of RCRA, 42 U.S.C. Secs. 6921-6939b (1982 & Supp. V), requires EPA to create a comprehensive regulatory scheme for the treatment, storage, and disposal of hazardous wastes. Under RCRA, EPA must "develop and promulgate criteria for identifying the characteristics of" those "solid" wastes[2] that are also "hazardous" wastes.[3] See 42 U.S.C. Sec. 6921(a), (b).
 
 
 5
 Pursuant to this statutory mandate, the agency has adopted a scheme under which it deems a solid waste hazardous if the waste meets either of two conditions. One condition is that the agency has, after a rulemaking proceeding, specifically listed the waste as hazardous. See 40 C.F.R. pt. 261, Subpart D (1989) (Lists of Hazardous Wastes).[4] The other condition is that the waste satisfies one or more of the following criteria that the agency has, by regulation, identified for hazardous waste: ignitability, corrosivity, reactivity, and extraction procedure toxicity. See 40 C.F.R. Secs. 261.11, 261.20-.24, 261.31-.32; see also Hazardous Waste Treatment Council v. EPA, 861 F.2d 270, 271 (D.C.Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989).
 
 
 6
 Either of these two conditions is sufficient for the agency to deem a "solid" waste "hazardous." When the agency lists or identifies a waste as hazardous, the waste's treatment, storage, and disposal is usually regulated by permit. See 42 U.S.C. Secs. 6922-6925.
 
 B. Procedural Background
 
 7
 Both this court and the agency have fully rehearsed the complex procedural history of this case. See Environmental Defense Fund v. EPA, 852 F.2d 1316, 1318-24 (D.C.Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989); 1988 Rule, 53 Fed.Reg. at 35,412-13. We therefore need reconstruct here only a skeletal portion of the history.
 
 
 8
 In 1980, after a rulemaking, the agency listed as "hazardous" six wastes ("six wastes") generated from primary metal smelters. See 45 Fed.Reg. 33,066, 33,124, 47,832-34 (1980) ("1980 Rule"). EPA listed the wastes pursuant to 40 C.F.R. Sec. 261.11(a)(3), because they contained one or more of the hazardous constituents listed in 40 C.F.R. pt. 261, App. VIII. The six wastes are as follows:
 
 
 9
 (1) Waste from Primary Copper Smelting and Refining, EPA Hazardous Waste No. K064 ("K064");
 
 
 10
 (2) Waste from Primary Lead Smelting, EPA Hazardous Waste No. K065 ("K065");
 
 
 11
 (3) Waste from Primary Zinc Smelting and Refining, EPA Hazardous Waste No. K066 ("K066");
 
 
 12
 (4) Waste from Primary Aluminum Reduction (spent potliner), EPA Hazardous Waste No. K088 ("K088");
 
 
 13
 (5) Waste from Ferrochromiumsilicon Production, EPA Hazardous Waste No. K090 ("K090"); and
 
 
 14
 (6) Waste from Ferrochromium Production, EPA Hazardous Waste No. K091 ("K091").
 
 
 15
 In October of 1980, in response to congressional enactment of the so-called "Bevill Amendment," EPA suspended its listing of the six wastes. See 46 Fed.Reg. 4614-15, 27,473 (1981); see also EDF v. EPA, 852 F.2d at 1319-31 (discussing Bevill Amendment and EPA response thereto). In 1985, EPA proposed a new rule that would, inter alia, involve relisting of the six wastes. See 50 Fed.Reg. 40,292, 40,295 (1985) ("1985 Proposal"). In publishing this proposal, the agency stated that:
 
 
 16
 [i]f any person disagrees with the listing of [the six wastes] based on additional information about their hazard, i.e., information which does not appear in the rulemaking record for the 1980 listings, they should explain the specific basis for their objections and provide additional information.
 
 
 17
 Id.
 
 
 18
 The agency never promulgated a rule based on the 1985 Proposal, and did not at that time relist the six wastes as hazardous. In EDF v. EPA, the two intervenor-applicants in the case now before us, the Environmental Defense Fund and the Hazardous Waste Treatment Council, pursued a judicial challenge to have the agency relist the six wastes. Granting those petitioners' requests, the court ordered the agency to "relist the six hazardous smelter wastes by August 31, 1988." See 852 F.2d at 1331. The agency complied with this order when it relisted the six wastes pursuant to the 1988 Rule. See 40 C.F.R. Sec. 261.32 (1989) (listing six wastes as "hazardous wastes from specific sources").
 
 
 19
 In promulgating the 1988 Rule, however, the agency did not interpret the court's order in EDF v. EPA as a requirement that the agency list the wastes, but rather as an order to cease treating the wastes as coming within the scope of the Bevill Amendment. Thus, EPA stated that its "decision to list these wastes today is based on its evaluation of the listing criteria (i.e., these wastes are hazardous) as well as the court finding that these wastes are not Bevill wastes," 1988 Rule, 53 Fed.Reg. at 35,413 n. 3, and that its "determination that these wastes are hazardous is based on its evaluation of the hazardousness of these wastes in 1980," id. at 35,417.
 
 
 20
 The agency also noted that, since 1980, it had "received additional information regarding these six wastes," partly in response to the agency's solicitation of comments regarding the 1985 Proposal. See id. In its view, "[t]he post-1980 data submitted to EPA [were] relevant primarily to issues other than the inherent hazardousness of the six wastes." Id. Nonetheless, the agency stated that,
 
 
 21
 [s]ince the issuance of the Court's opinion, EPA has conducted a review of some of the waste characterization data received since 1980. While EPA did not, in light of the short time-frame for publication of this rule, exhaustively evaluate all of the post-1980 waste characterization data submitted, the review that was conducted tends to corroborate and confirm that the six waste streams meet the criteria for hazardousness found in section 3001(a) of RCRA. EPA's review suggests that no data have been submitted which would clearly contradict EPA's 1980 decision to list the six smelter wastes, i.e., no data are available to refute the basic conclusion that these wastes contain significant concentrations of toxic constituents and that the constituents are mobile and persistent. Therefore, EPA continues to believe that each of these wastes meets the criteria for listing as hazardous waste found at 40 CFR 261.11 and sees no reason not to resume the 1980 listings of these six wastes at this time.
 
 
 22
 EPA nevertheless intends to thoroughly evaluate all information and comments submitted since 1980 regarding the hazardousness of these six wastes. Responses to a number of the comments are included in the docket for today's notice. The Agency will respond to the remainder of the comments within the next few months. EPA will treat any post-1980 submissions as a petition for rulemaking to reconsider these listings. EPA will publish a subsequent Federal Register notice on the results of its more detailed evaluation of these six wastes pursuant to 40 CFR 260.20. That evaluation will consider new data received in a timely manner as well as the currently available data.
 
 
 23
 Id.
 
 
 24
 Notwithstanding the asserted "review" of post-1980 data, the agency explicitly chose to rely only on data gathered in 1980 to support its decision to relist the six wastes pursuant to the 1988 Rule. In explaining its decision regarding each waste, the agency offered a brief summary description of some of the factors on which it had relied, followed by the assertion that "[t]hese and other factors considered by the Agency are explained in the [1980] Listing Background Document" for the various wastes. See id at 35,414 (K064, K065), 35,415-16 (K066), 35,416 (K088, K090, K091).
 
 II. ANALYSIS
 A. Introduction
 
 25
 Petitioners offer three arguments to show that the agency's listing of the six wastes as "hazardous" in the 1988 Rule is unlawful. First, they challenge the agency's interpretation of the term "discarded" in RCRA, see 42 U.S.C. Sec. 6903(27). Relying principally on the decision of this court in American Mining Congress v. EPA, 824 F.2d 1177, 1179 (D.C.Cir.1987) ("AMC "), petitioners argue that three of the six wastes are not "discarded," and therefore are not "solid wastes," and therefore cannot be "hazardous" wastes within the meaning of RCRA. Second, petitioners argue that because the agency relied on the notice and comment periods it offered the public prior to the 1980 Rule, and again in 1985, but chose not to hold another period of notice and comment prior to issuing the 1988 Rule, the agency violated the APA. Cf. 5 U.S.C. Sec. 553 (1988). Third, petitioners argue that EPA has inadequately explained the bases of its decision to relist the six wastes as hazardous. Cf. 5 U.S.C. Sec. 706(2)(A) (APA "arbitrary and capricious" standard).
 
 
 26
 We will address each contention in turn. Before doing so, however, we must dispose of a procedural question about our jurisdiction over three of the six consolidated petitions.
 
 B. Jurisdiction Over Petitioners' Claims
 
 27
 The jurisdictional issue that confronts us arises from the pendency of petitions before EPA by three of the petitioners. The Aluminum Association and the Ferroalloys Association filed petitions with EPA requesting administrative reexamination of the 1988 Rule; then, while these petitions were pending, these same parties filed petitions for review of the 1988 Rule in this court.[5] The American Mining Congress filed a petition for judicial review of the 1988 Rule, and then filed a petition with EPA seeking administrative reexamination.[6] Observing the posture of these three petitioners, we directed the parties to file supplemental briefs on the question whether this court has jurisdiction over a petition for review when the petitioner has submitted an administrative petition for reconsideration of the agency action prior to or after filing its petition for judicial review, and the petition for reconsideration has not been acted on by the agency.
 
 
 28
 In United Transp. Union v. ICC, 871 F.2d 1114 (D.C.Cir.1989), we concluded that it was "plain that a pending petition for rehearing must render the underlying agency action nonfinal (and hence unreviewable) with respect to the filing party." Id. at 1116. Thus, if the Aluminum Association and the Ferroalloys Association filed petitions for rehearing or reconsideration with EPA that were pending at the time they sought review in this court, then under UTU their petitions in this court would be untimely. Although the American Mining Congress filed its petition for review with this court before petitioning for administrative reexamination, if that administrative petition was also a petition for reconsideration, then our cases raise the question whether that subsequent administrative petition renders the petition in this court "incurably premature." See TeleSTAR v. FCC, 888 F.2d 132, 133 (D.C.Cir.1989) (petition for review made unripe under UTU by pendency of request for agency reconsideration does not ripen so as to vest court with jurisdiction once agency issues final decision on reconsideration); see also id. at 134 n. 1 (declining to consider case in which "petitioner first seeks court review of a final agency action and then subsequently requests consideration before the agency").
 
 
 29
 On the record of this case, we conclude that UTU and TeleSTAR are inapplicable. In the 1988 Rule, EPA asserted that it would "treat any post-1980 submissions as a petition for rulemaking to reconsider these listings." 53 Fed.Reg. at 35,417. We see no good reason to take the agency other than at its word, and so we must consider the three administrative petitions as petitions for new rulemaking. Such petitions do not, of course, pose any problem for our subject-matter jurisdiction, for UTU and TeleSTAR do not bar petitions for judicial review in the face of petitions for new rulemaking. Cf. American Petroleum Inst. v. EPA, 906 F.2d 729, 740 (1990) ("[A]n agency always retains the power to revise a final rule through additional rulemaking. If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely.").
 
 
 30
 C. EPA's Interpretation of the Term "Discarded"
 
 
 31
 As we have noted in a prior decision, EPA's regulatory authority under RCRA Subtitle C "extends only to the regulation of 'hazardous waste.' Because 'hazardous waste' is defined as a subset of 'solid waste,' ... the scope of EPA's jurisdiction is limited to those materials that constitute 'solid waste.' " AMC, 824 F.2d at 1179.[7] Cf. 42 U.S.C. Sec. 6903(5) (defining "hazardous waste" as subset of "solid waste"). Petitioners argue that three of the six wastes at issue in this case (K064, K065, and K066) are not "solid" wastes, because they are not "discarded" within meaning of RCRA, but are instead "beneficially reused in mineral processing operations." Final Brief of Consolidated Petitioners at 12.
 
 
 32
 The primary smelting operations that generate these three wastes produce large volumes of wastewater that the smelting company must treat before discharging it. Many smelting operations use surface impoundments to collect, treat, and dispose of the wastewater. These impoundments continuously produce sludges, which precipitate from the wastewater. See 42 U.S.C. Sec. 6903(26A) (defining "sludge" to cover "any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant").
 
 
 33
 Petitioners' basic claim is that sludges from wastewater that are stored in surface impoundments and that may at some time in the future be reclaimed are not "discarded." The agency, however, exercising its expert judgment, has concluded that, because these sludges are the product of wastewater and are stored in impoundments that threaten harm to the health and environs of those living nearby, these materials are "discarded."
 
 
 34
 Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), guides our review of the agency's interpretation of RCRA. Under Chevron 's well-settled two-step test, we begin by considering "whether Congress has directly spoken to the precise question at issue"; if it has, then we "must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781. If Congress has not directly spoken to the precise issue, then we will defer to the agency's reading of the statute as long as it is "permissible," id. at 843, 104 S.Ct. at 2781, that is, "so long as it is reasonable and consistent with the statutory purpose." Ohio v. Department of the Interior, 880 F.2d 432, 441 (D.C.Cir.1989).
 
 
 35
 This court has recently had occasion to consider the meaning of the term "discarded" in RCRA under the first step of Chevron analysis. In American Petroleum Inst. v. EPA, 906 F.2d 729 (D.C.Cir.1990) ("API "), we concluded that the term "discarded" was marked by the kind of ambiguity demanding resolution by the agency's delegated lawmaking powers. See API, at 740-741. Petitioners direct us to nothing whatsoever in the language, overall structure, or legislative history of the statute, nor do we know of anything therein, that shows the term "discarded" to be any less ambiguous regarding sludges stored in surface impoundments than it was regarding the materials at issue in API.
 
 
 36
 To support their claim that RCRA forecloses EPA regulation of these sludges, petitioners invoke this court's decision in AMC, 824 F.2d 1177. At issue in AMC was whether EPA could, under RCRA, treat as "solid wastes" "materials that are recycled and reused in an ongoing manufacturing or industrial process." Id. at 1186 (emphasis in original). We held that the agency could not treat such materials as solid wastes, because they "have not yet become part of the waste disposal problem; rather, they are destined for beneficial reuse or recycling in a continuous process by the generating industry itself." Id. (emphasis in original). Because such materials were never "disposed of, abandoned, or thrown away," we concluded, they were not "discarded" within the meaning of RCRA. Id. at 1193.
 
 
 37
 Petitioners read AMC too broadly. AMC 's holding concerned only materials that are "destined for immediate reuse in another phase of the industry's ongoing production process," id. at 1185 (emphasis added),[8] and that "have not yet become part of the waste disposal problem," id. at 1186. Nothing in AMC prevents the agency from treating as "discarded" the wastes at issue in this case, which are managed in land disposal units that are part of wastewater treatment systems, which have therefore become "part of the waste disposal problem," and which are not part of ongoing industrial processes. Indeed, API explicitly rejected the very claim that petitioners assert in this case, see Final Brief of Consolidated Petitioners at 12-13, namely, that under RCRA, potential reuse of a material prevents the agency from classifying it as "discarded." See API, at 740-741.
 
 
 38
 Because Congress has not directly spoken to the precise question at issue, we must consider whether the agency's interpretation of the term "discarded" was "permissible," see Chevron, 467 U.S. at 843, 104 S.Ct. at 2781, that is, "reasonable and consistent with the statutory purpose," Ohio v. Department of the Interior, 880 F.2d at 441. In this case, the agency determined that material placed in wastewater treatment surface impoundments where it is "capable of posing a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed," 40 C.F.R. Sec. 261.11(a)(3), by leaching into the ground, is "discarded material," and hence a "solid waste." As the agency notes, because of their propensity to leak hazardous materials into the environment, surface impoundments are a central focus of RCRA's regime. See, e.g., 42 U.S.C. Secs. 6901(b)(7),[9] 6924(k)[10], (o ), 6925(j). In addition, Congress made clear in the legislative history of RCRA its concern to regulate hazardous materials in surface impoundments. See, e.g., H.R.REP. NO. 1491, 94th Cong., 2d Sess. 2-3 (1976); S.REP. NO. 284, 98th Cong., 1st Sess. 13-16 (1983). In light of this evidence, we conclude that the agency's interpretation of "discarded" is both reasonable and consistent with the statutory purposes of RCRA.
 
 
 39
 D. EPA's Findings That the Six Wastes are Hazardous
 
 
 40
 We next consider petitioners' several arguments that "the record does not support EPA's finding that the six materials are hazardous," Final Brief of Consolidated Petitioners at 9. We begin by noting relevant guidelines for our review of petitioners' contentions.
 
 1. Standards of Review
 
 41
 It is not the court's role to "second-guess the scientific judgments of the EPA," New York v. EPA, 852 F.2d 574, 580 (D.C.Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989), and "[t]he Administrator may apply his expertise to draw conclusions from suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections from imperfect data, from probative preliminary data not yet certifiable as 'fact,' and the like." Ethyl Corp. v. EPA, 541 F.2d 1, 28 (D.C.Cir.) (en banc ), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).
 
 
 42
 Deference to the agency does not, however, require us to abdicate the judicial duty carefully to "review the record to ascertain that the agency has made a reasoned decision based on 'reasonable extrapolations from some reliable evidence,' " Natural Resources Defense Council v. EPA, 902 F.2d 962, 968, (D.C.Cir.1990) (quoting Natural Resources Defense Council v. Thomas, 805 F.2d 410, 432 (D.C.Cir.1986)), to ensure that the agency has examined "the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,' " Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Moreover, if we find that the agency has failed to meet its obligation to engage in reasoned decisionmaking, we are not at liberty to "supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43, 103 S.Ct. at 2867 (citing SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). Also, in assessing the reasoned quality of the agency's decisions, we are mindful that the notice-and-comment provision of the APA, see 5 U.S.C. Sec. 553(c), "has never been interpreted to require [an] agency to respond to every comment, or to analyse [sic] every issue or alternative raised by comments, no matter how insubstantial." Thompson v. Clark, 741 F.2d 401, 408 (D.C.Cir.1984) (citation omitted). Rather, the agency need respond only to those " 'comments which, if true, ... would require a change in an agency's proposed rule.' " ACLU v. FCC, 823 F.2d 1554, 1581 (D.C.Cir.1987) (emphasis omitted) (quoting Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 n. 58 (D.C.Cir.1977)), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988).
 
 
 43
 2. Analysis of EPA Decision to List Six Wastes
 
 
 44
 Applying these well-worn standards to the agency's decision in the 1988 Rule to relist the six wastes, we get mixed results. We conclude that regarding some of the six wastes, the agency met its obligation to engage in reasoned decisionmaking. Regarding others, however, the agency has not lived up to that duty, particularly because the 1980 data and reports on which the 1988 Rule exclusively relies do not adequately address petitioners' significant challenges. In their briefs to this court, agency counsel sometimes invoke post-1980 studies to support EPA's judgment in the 1988 Rule. However, we cannot accept "post-hoc rationalizations" that the agency did not offer in the 1988 Rule itself. See State Farm, 463 U.S. at 50, 103 S.Ct. at 2870 (post-hoc rationalizations by counsel cannot cure deficiencies in agency decisionmaking); National Coalition Against the Misuse of Pesticides v. Thomas, 809 F.2d 875, 882-83 (D.C.Cir.1987) (same).
 
 
 45
 (a) K066
 
 
 46
 Petitioners offer several arguments to challenge the agency's listing of K066. They argue that the record does not support EPA's conclusion that K066 contains "significant" concentrations of cadmium and lead, and that, "even under mild conditions, the possibility of ground water contaminated via leaching may exist if these wastes are mismanaged." 1988 Rule, 53 Fed.Reg. at 35,416. They also contend that EPA's most recent test results demonstrate that the quantities of cadmium and lead that might leach from K066 are so small that the potential for groundwater contamination is insignificant. See Final Brief for Consolidated Petitioners at 36. Additionally, they assert that, in 1977, the only K066 material tested (acid plant blowdown sludge) showed cadmium levels below EPA's primary drinking water standard for cadmium and lead levels less than 50 times the applicable drinking water standard. See id. at 36-37; see also 1977 Non-Ferrous Assessments, reprinted in J.A. 287 (showing distilled water extraction test results of 

 
 
 47
 In the 1988 Rule, EPA stated that it relisted the six wastes as hazardous for the reasons set forth in the May 19 and July 16, 1980 listings and the associated Listing Background Documents. See 1988 Rule, 53 Fed.Reg. 35,413-13, 35-417. EPA concluded that no data were submitted that would clearly contradict EPA's 1980 decision to list the six smelter wastes, i.e., no data were available to refute the basic conclusion that these wastes contain significant concentrations of toxic constituents and that the constituents are mobile and persistent. See id. at 35,417. However, EPA did not specifically mention any post-1980 studies in the 1988 Rule. It provided only the summary statement that "Cadmium and lead have been shown to leach from samples of these wastes when the samples were subjected to a distilled water extraction procedure." See id. at 35,416. Instead of discussing post-1980 data, the agency cited only the 1980 Listing Background Document for Primary Zinc Smelting and Refining as further explanation for its determination. See id. EPA does not respond to the challenges petitioners raise concerning the 1977 studies. In short, there is no adequate explanation in the 1988 Rule for the listing of K066. Even in the brief to this court, EPA merely states that samples of zinc acid plant blowdown sludge contained 2,000 ppm cadmium and 18,100 ppm lead, and concludes that these constituents had the potential for leaching. See Brief for the Respondent at 30 (citing 1980 Zinc Background Document, reprinted in J.A. 183). Such conclusory statements are not sufficient to address petitioners' challenges concerning particular studies. Accordingly, we must remand to the agency for a fuller explanation of its decision to list K066.
 
 
 48
 (b) K064
 
 
 49
 Petitioners claim that EPA did not obtain representative samples of each of the types of K064 materials and that therefore the results do not support the K064 listing. They argue that the 1977 distilled water extraction test used by EPA resulted in an extract containing 8.4 ppm cadmium and 7.8 ppm lead. See Final Brief of Consolidated Petitioners at 41. EPA failed to adequately address this challenge in the record. In the 1988 Rule, the agency offered no discussion of the studies upon which it relied, and provided no explanation of why its conclusion would be reasonable even absent such studies. It is, of course, the agency's, not the advocate's explanation to which we owe deference, and for that we must turn to the record. As with the explanation for listing K066, we find there only conclusory statements that do not respond to the petitioner's challenges in any coherent manner. See, e.g., 1988 Rule, 53 Fed.Reg. at 35,414; 1980 Copper Background Document, reprinted in J.A. 134-50. As with K066, we must remand for fuller explanation of the decision to list.
 
 
 50
 (c) K065
 
 
 51
 Petitioners claim that the administrative record is devoid of factual support for EPA's decision to list K065 as hazardous. According to petitioners, EPA's draft report, "Analysis of Human Health Risks Associated with the Management of Hazardous Wastes from the Primary Smelting and Refining Industries," reprinted in J.A. 874, concluded that there is no significant risk from wastewater treatment sludges from primary lead facilities. Petitioners contend that the data base consisting of wastewater analyses before and after treatment and of single samples of "impoundment dredgings" from two unidentified locations is too limited to support EPA's conclusion. See Final Brief for Consolidated Petitioners at 44. They also argue that the samples were taken from "lagoon dredgings (slag granulation)" and do not represent the spectrum of materials listed as K065, which includes acid plant blowdown, slag granulation water and plant washdown. See id. at 44-45. Additionally, they challenge the solubility test procedure employed. See id. at 47.
 
 
 52
 EPA's decision to list K065 is based on a finding that K065 contains lead and cadmium in "significant" concentrations, and that lead and cadmium "have been shown to leach from [K065 samples] using an extraction procedure designed to predict the release of contaminants into the environment." 1988 Rule, 53 Fed.Reg. at 35,414. EPA counsel contends that "[petitioners'] arguments completely ignore all of the data collected in 1984 and subsequently which support the 1980 determination to list the waste and therefore are without merit." Brief for the Respondent at 37. The 1988 Rule, however, does not discuss any 1984 or subsequent data. Indeed, neither the 1988 Rule nor the 1980 Lead Background Document, to which the 1988 Rule refers, addresses petitioners' challenges. See, e.g., 1988 Rule, 53 Fed.Reg. at 35,414; 1980 Lead Background Document, reprinted in J.A. 151-76. Thus, here again we must remand to the agency for clearer explanation of its decision to list K065.
 
 
 53
 (d) K088
 
 
 54
 Petitioners claim that substantial portions of spent potliner do not contain hazardous levels of cyanide, citing post-1984 studies to support this contention. We conclude, however, that EPA need not have considered post-1984 studies in relisting the materials and that the K088 listing can therefore survive petitioners' challenge.
 
 
 55
 EPA listed spent potliner in 1980 based upon findings that potliner can leach significant concentrations of cyanides when disposed of on land; it cited evidence of cyanide-contaminated groundwater in several cases, including one case in which an aluminum plant had to provide an alternate source of drinking water for residents due to the cyanide contamination of eighteen drinking water wells in Washington state. See 1980 Spent Potliner Background Document, reprinted in J.A. 304. The 1988 Rule indicates that EPA relied on the 1980 data, not on subsequent data, as a basis for its determination that potliners are hazardous wastes. The 1980 Spent Potliner Background Document states that "[n]o information was submitted during the public comment period that disagreed with the conclusion that spent potliners are hazardous as defined by the proposed regulation." J.A. 306. Post-1980 data form the basis for the petitioners' challenge to the listing; in accordance with the agency's instructions, see 1988 Rule, 53 Fed.Reg. at 35,417, those challenges may properly be considered as a petition for new rulemaking, but they do not render arbitrary and capricious that agency's determination that, based on 1980 data, spent potliners are hazardous wastes.
 
 
 56
 (e) K090 and K091
 
 
 57
 In 1980, EPA proposed to amend the characteristic of extraction procedure toxicity to apply to hexavalent chromium instead of total chromium, see 45 Fed.Reg. 72,029 (1980), based on EPA's recognition that trivalent chromium is not a health hazard, see id. at 72,030. Petitioners claim that EPA, having raised the trivalent/hexavalent chromium issue in 1980 and 1981, arbitrarily and capriciously ignored the issue completely when it made the listing decision in the 1988 Rule. The petitioners claim, in addition, that EPA violated RCRA Sec. 3001(a) and 40 C.F.R. Sec. 261.11(a)(3) by listing ferroalloy dusts and sludges on the basis of the presence of total chromium when the record indicates that these materials contain nearly exclusively trivalent chromium. They also argue that relevant chromium does not exhibit the toxicity EPA sought to regulate. See Final Brief of Consolidated Petitioners at 65-66. They also note that sixteen other wastes listed because of the presence of chromium were listed on the basis of hexavalent chromium, not total chromium, and that EPA's action here is therefore not consistent with this regulatory precedent, in violation of 40 C.F.R. Sec. 261.11(a)(3)(x). See id. at 66. Moreover, they claim that there is no evidence in the record that chromium has the potential to migrate even if the ferrochromium and ferrochromium silicon materials are improperly managed.
 
 
 58
 EPA summarizes petitioners' claims as posing the issue whether the ferroalloy wastes have the potential to leach significant concentrations of Cr(VI). Because EPA relies on data not cited in the 1988 Rule to respond to AMC's challenges concerning EPA's classification based on total chromium, see Brief for the Respondent at 47-48 (citing Ferro Ass'n Supp. Comments at 19, 27, reprinted in J.A. 434, 442), we must remand for further explanation. However, we deny the petitioners' petition concerning the volume of ferroalloy wastes. They contend that EPA improperly failed to consider the decline in the amount of K090 and K091 generated nationwide since 1980 due to economic conditions. That challenge is based on post-1980 data and may be raised in a petition for new rulemaking.
 
 3. Summary of Court's Conclusions
 
 59
 For reasons discussed above, we conclude that the 1988 Rule does not articulate a satisfactory explanation of the relation between the facts the agency found and the choices the agency made, see State Farm, 463 U.S. at 43, 103 S.Ct. at 2866, with regard to the following materials: K066, K065, K064, and, in part, K090 and K091. We reject the petitioners' contention regarding the listing of K088.
 
 
 60
 We are constrained to remand to the agency for a fuller explanation regarding the aforementioned materials, because, for the most part, in the 1988 Rule, apart from summary conclusions, the agency expressly relies only on 1980 background reports. Neither the summary comments nor the 1980 reports respond with sufficient clarity or specificity to the petitioners' admittedly significant challenges. Moreover, in its brief, agency counsel sometimes cites data on which the agency did not rely in the 1988 Rule. In sum, the agency's failure to respond to petitioners' specific challenges in the record is fatal here, since "the points raised in the comments were sufficiently central that agency silence ... demonstrate[s] the rulemaking to be arbitrary and capricious." Natural Resources Defense Council v. EPA, 859 F.2d 156, 188 (D.C.Cir.1988).
 
 
 61
 In reaching this conclusion we do not attempt to substitute our judgment for the expert judgment of the agency. We do not conclude that the agency is incapable of adducing sufficient evidence reasonably to support its decision to list the materials at issue. Indeed, some of that evidence may already be part of the post-1980 data to which the agency alludes. However, we cannot, consistently with our limited role in reviewing agency decisions, adduce the relevant material and reach the reasoned decision ourselves; that task remains to be done by the agency.
 
 
 62
 The agency candidly asserts, and we acknowledge, that EPA was pressured to list the six materials quickly in light of this court's order in EDF v. EPA. See Brief for the Respondent at 14 n. 16 (seeking "extra deference" because, "in 1988, this Court gave EPA very little time to consider relisting the six smelting wastes"). However, EPA clearly understood that it had an obligation to engage in reasoned decisionmaking, for in the 1988 Rule the agency purported to base its decision to relist not only on the court's order, but on its "evaluation of the listing criteria." See 1988 Rule, 53 Fed.Reg. at 35,413 n. 3; see also id. at 35,417.[11] That an agency has only a brief span of time in which to comply with a court order cannot excuse its obligation to engage in reasoned decisionmaking under the APA.
 
 E. Notice and Comment for the 1988 Rule
 
 63
 Petitioners argue that the agency failed to meet the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. Sec. 553 (1988), because it did not hold a new period for notice and comment prior to promulgating the 1988 Rule. In response, EPA contends that it did not run afoul of this APA provision, either because it did hold two periods of notice and comment (one for the 1980 Rule, and one in 1985 for the 1985 Proposal), or because its decision satisfied the "good cause" exception to that provision.[12]
 
 
 64
 We agree with the agency that the APA imposed on it no obligation to hold a new period of notice and comment before promulgating the 1988 Rule. As noted above, the agency did hold two periods of notice and comment prior to issuing the 1988 Rule. In response to its interpretation of the Bevill Amendment, the agency temporarily rescinded its decision in the 1980 Rule to list the six wastes as hazardous. However, in addition to soliciting additional comments on the hazardousness of the six wastes in 1985, see 1985 Proposal, 50 Fed.Reg. at 40,295, the agency relied on the data acquired in the full-fledged notice and comment process it conducted for the 1980 Rule.
 
 
 65
 Faced with a similar administrative-procedural question, this court concluded that an agency does not fail to satisfy the notice-and-comment requirement where, after one full period of notice and comment for a rule, and after withdrawal of the rule in light of congressional action, the agency reinstates a rule without an additional notice and comment period. See American Fed'n of Gov't Employees v. Office of Personnel Management, 821 F.2d 761, 764 (D.C.Cir.1987).
 
 
 66
 In AFGE, Congress suspended a set of final agency regulations--prior to which there had been a full period of notice and comment--two weeks before they were to become effective. Two years later, the suspension lapsed on its own terms, and the final rule went into effect without a new period of notice and comment. This court concluded that the APA required no new notice and comment period, and suggested that the agency could cure--as in fact it already had in AFGE--any obsoleteness in the rule in a subsequent rulemaking. See id.
 
 
 67
 We find the reasoning of AFGE applicable to the case before us. In the 1988 Rule, EPA clearly stated that it would consider additional information about the hazardousness of the six materials in petitions for new rulemaking. See 1988 Rule, 53 Fed.Reg. at 35,417 (EPA will "treat any post-1980 submissions as a petition for rulemaking to reconsider these listings"). That method of bringing new data to the agency's attention will satisfy the demands of APA section 553.[13]
 
 III. CONCLUSION
 
 68
 The agency did not exceed its statutory authority in treating the six wastes as "discarded," and thus subject to RCRA Subtitle C regulation. Nor did it run afoul of the APA notice-and-comment requirement. However, EPA failed in the 1988 Rule to articulate a rational connection between the data on which it purportedly relied and its decision to reject the petitioners' admittedly significant challenges. Therefore, we remand to the agency for fuller explanation of its decision to list K064, K065, K066, and, in some respects, K090 and K091.
 
 
 69
 So ordered.
 
 
 
 [1]
 The six petitioners are: American Mining Congress, ASARCO Incorporated, The Aluminum Association, The Ferroalloys Association, Horsehead Resource Development Corporation/Zinc Corporation of America, and Phelps Dodge Corporation
 
 
 [2]
 Under RCRA, a "solid" waste is
 any garbage, refuse, sludge from a wastewater treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from ... mining ... operations....
 42 U.S.C. Sec. 6903(27).
 
 
 [3]
 Under RCRA, a "hazardous" waste is
 a solid waste ... which ... may--(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.
 42 U.S.C. Sec. 6903(5).
 
 
 [4]
 The agency has, in turn, established three grounds upon which to list a waste as hazardous, including a finding that the waste contains any of the toxic constituents appearing in 40 C.F.R. pt. 261, App. VIII. See 40 C.F.R. Sec. 261.11(a)(3)
 
 
 [5]
 The Aluminum Association filed its administrative petition with EPA on November 9, 1988, and filed its petition for judicial review (in No. 88-1837) on November 29, 1988. The Ferroalloys Association filed its administrative petition with EPA on October 7, 1988, and filed its petition for judicial review (in No. 88-1839) on November 29, 1988
 
 
 [6]
 The American Mining Congress filed its petition for judicial review (in No. 88-1835) on November 29, 1988, and filed its administrative petition on March 28, 1989
 
 
 [7]
 For RCRA's definitions of "solid waste" and "hazardous waste," see notes 2-3, supra
 
 
 [8]
 Cf. id. at 1184 ("materials retained for immediate reuse"); id. at 1190 (materials "passing in a continuous stream or flow from one production process to another")
 
 
 [9]
 [C]ertain classes of land disposal facilities are not capable of assuring long-term containment of certain hazardous wastes, and to avoid substantial risk to human health and the environment, reliance on land disposal should be minimized or eliminated, and land disposal, particularly landfill and surface impoundment, should be the least favored method for managing hazardous wastes;
 
 
 [10]
 For the purposes of this section, the term "land disposal", when used with respect to a specified hazardous waste, shall be deemed to include, but not be limited to, any placement of such hazardous waste in a landfill, surface impoundment, waste pile, injection well, land treatment facility, salt dome formation, salt bed formation, or underground mine or cave
 
 
 [11]
 The agency seems correctly to have understood that the order of this court in EDF v. EPA, see 852 F.2d at 1331, was not based on any substantive consideration under the APA of the reasonableness of the listing decision. Rather, we merely put the listing decision back in the posture in which it had been prior to the agency's action in response to the Bevill Amendment
 
 
 [12]
 See 5 U.S.C. Sec. 553(b) (notice and comment not required where, inter alia, "the agency for good cause finds (and incorporates the finding and a brief statement therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.")
 
 
 [13]
 Because we reach this conclusion, we need not, and do not, consider whether the agency could have successfully invoked the "good cause" exception to section 553